## Findley v. C. W. Cowles, *et al.*, Appellants.

**Principal and Agent.** Where the vice president of a bank acts for himself against the interests of the bank and its other officers know nothing of the act, the bank is not bound by the knowledge of the vice president.

**Consideration.** A vice president took credit for doubtful stock in another corporation, and withdrew it upon the objection of the auditor of state. He replaced it with notes signed by his father, who had a large interest in the bank. He had complete control of his father's business, and the stock, then of some value, passed to him or his father. Later, he secretly withdrew and canceled the note and re-deposited the stock in payment. *Held*, the father's notes were on sufficient consideration and said act did not constitute a payment to the bank.

**Jurisdiction.** An insane person residing in Nebraska appears to a claim in Iowa by a guardian appointed in Nebraska. Pending suit the insane person dies and an Iowa executor is appointed and defends. *Held*, the guardian ceases to be a party, and the Iowa court has jurisdiction.

*Appeal from Clarke District Court.*—Hon. H. M. Towner, Judge.

Tuesday, January 22, 1895.

This action was commenced November 20, 1889, against C. W. Cowles, George H. Cowles, and

others. C. W. Cowles alone was served and appeared. Before issue was joined, C. W. Cowles was adjudged insane by the court of Nebraska, and Ida C. West appointed guardian of his person and property. On April 29, 1890, in obedience to an order of the District Court of Clarke county, Iowa, said guardian appeared and answered. On May 19, 1890, plaintiff filed an amendment to his petition, alleging the death of George H. Cowles; that his estate was insolvent; and that C. W. Cowles had removed from the state; and asking an attachment against the property of C. W. Cowles, which was issued, and levied upon certain property. At the February term, 1891, the case was tried upon the issues joined as an equity cause, and taken under advisement. On the twenty-eighth day of April, 1892, and before a decision had been rendered, the death of C. W. Cowles being suggested, George L. Moore, executor, was made a party, and answered, denying generally the allegations of the petition. On July 11, 1892, judgment was entered in favor of the plaintiff for thirteen thousand six hundred dollars, debt, and one hundred and seventy-six dollars, attorney's fees and costs, with eight per cent. interest from date of judgment; and it was ordered that said executor pay said amount as a claim against said estate. The issues and facts sufficiently appear in the opinion. The defendant George L. Moore, executor, appeals.—*Affirmed.*

*J. W. West* and *McIntire Bros. & Jamison* for appellant.

*M. L. Temple* and *John Chaney* for appellee.

Given, C. J.—I. This action, as originally brought, was to charge C. W. Cowles with an indebtedness to plaintiff in the sum or ten thousand dollars and

interest, and, as it now stands, it is to charge the same to his estate. The controversy is solely between the plaintiff and the estate, and what is alleged as to the original defendants except C. W. Cowles is, so far as pertinent, only material as evidence. The issues between the plaintiff and C. W. Cowles will appear from the following facts, which are shown by the evidence: Prior to February, 1886, G. H. Cowles, son of Dr. C. W. Cowles, then residing in Van Buren county, resided at, and was carrying on a private bank at, Osceola. In February, 1886, said bank was incorporated under the laws of the state as the Osceola Bank, with a paid-up capital stock of twenty-five thousand dollars, of which Dr. Cowles held fifteen thousand dollars. · John Richards was president, G. H. Cowles vice-president, and C. H. Currier cashier, and continued to occupy such positions during the time the bank did business. These officers, with others, all but one of whom resided at or near Osceola, constituted the board of directors. G. H. Cowles was the active manager of the business of the plaintiff bank. Prior to the incorporation of this bank, the Lucas Land & Live-Stock Company was incorporated, with thirty thousand dollars capital stock, of which G. H. Cowles held twenty-nine thousand seven hundred dollars, and of which company he was president. Some time after the bank was incorporated, G. H. Cowles placed therein two certificates, for five thousand dollars each, of the capital stock of said land and live-stock company, and was credited therefor at the face value thereof. Later he deposited and took credit for nineteen thousand seven hundred dollars more of the stock of said land and live-stock company. The auditor of state, on report of the bank examiner, objected to the bank carrying even the ten thousand dollars of said stock as assets. As this controversy rests upon what took place

with respect to the two certificates for the ten thou-
sand dollars of stock, it is not material nor does it fully
appear what disposition was made of the nineteen
thousand seven hundred dollars of stock. To meet the
objection of the auditor, G. H. Cowles placed in the
bank two promissory notes, signed C. W. Cowles, dated
January 2, 1887, for five thousand dollars each, with
eight per cent. interest, payable to the Osceola Bank
twelve months after date. Upon making this deposit,
said two certificates were withdrawn from the bank,
and said notes carried as assets. The dates in the
entries of bills receivable show that this transaction
took place on April 1 or 2, 1887. On January 5, 1888,
G. H. Cowles withdrew these notes from the bank, and
deposited said two certificates for ten thousand dollars
in lieu thereof, the notes being entered on bills receiv-
able as "Paid, Jan. 5, 1888," though no other payment
was made than the return of said shares of stock. At
the time the notes were taken up and the stock returned
to the bank, the stock was of but little value. The
account of G. H. Cowles with the bank was overdrawn;
hence it is apparent that the bank paid to him ten thou-
sand dollars on account of the two stock certificates
placed to his credit, and that they became the property
of the bank.

While it does not appear under what form of
authority G. H. Cowles acted for his father, it is evident
that he exercised general control over his father's bus-
iness in connection with this bank, and in Clarke
county, and that his acts were either authorized or rati-
fied. It is reasonably clear that G. H. Cowles had the
consent of his father to act for him in the conduct of his
business in Clarke county. There can be no doubt but
that two notes, such as those set out, existed, and that
they bore the name C. W. Cowles. While there is no
direct evidence as to the signing of said notes, we must·

conclude that they were signed by C. W. Cowles or by
his authority, or that G. H. Cowles, or some one with
his knowledge, committed a forgery.   It is apparent
from the business and other relations of G. H. and his
father that Dr. Cowles would not have hesitated to sign
such notes at the request of his son under the circum-
stances and for the purpose for which these notes were
executed.   We are satisfied that C. W. Cowles signed
the notes at the request of G. H. Cowles, with the under-
standing that they were to be placed in the bank as
part of its assets, in lieu of the ten thousand dollars
objectionable stock, and that they were to be taken up
when it could be done without invoking opposition
from the auditor by returning the stock to the bank.
Such was manifestly the purpose of G. H. Cowles, and
we do not doubt that he so explained it to his father.
The conclusion is irresistible that G. H. Cowles, acting
in his own interest, as owner of the depreciated land
and live-stock company's stock, attempted to perpe-
trate a fraud upon the bank by having, upon his own
motion, the stock placed to his credit at par, and draw-
ing the amount thereof.   It is equally apparent that he
attempted to deceive and defraud the state authorities
and the public in changing the assets of the bank, and
in this we think Dr. Cowles knowingly aided, by execut-
ing said notes.   G. H. Cowles and his father owned a
large majority of the bank stock, and G. H. seems to
have controlled the business of the bank in his own
way, and without consultation with the other
officers.   While the other officers and share-
holders might have learned of the transaction
under consideration by examining the books, it does
not appear that they did so, and we are satisfied that
G. H. Cowles purposely omitted to inform them thereof.
C. H. Currier, the cashier, is the only one that appears
to have known of these transactions, and he was not

consulted or asked to assent to them. He knew of them only as he was ordered by G. H. Cowles to make the entries in the books.

II. Plaintiff's contention is that, by the execution and delivery of said notes to the bank, they became the property of the bank; that the withdrawal of said notes by George H. Cowles, and the substitution of said stock therefor, was not authorized, was a fraud upon the state auditor, the bank, and the public, and does not constitute a payment of said notes. He brings into court, and tenders to defendant, said two certificates of stock, and asks to recover the full amount represented by said notes. Appellant's first contention is that the notes are without consideration, and were mere accommodation notes. It is true the bank did not pay to Dr. Cowles any money in consideration for these notes, but it is equally true that said two stock certificates, that were then of some value, were taken from the bank in consideration for the notes, and became the property of C. W. Cowles or his son. The stock was not worth near the face of the notes; hence, without other explanation, it would seem unreasonable that the notes were given therefor. Dr. Cowles and his son were the principal shareholders in the bank. The son had deposited to his credit the objectionable stock, which had to be replaced with some acceptable asset. It is in these facts that we find the reason why Dr. Cowles was willing to give his notes for the stock, induced, no doubt, by the promise of his son that in time the notes should be replaced by the stock. It cannot be said that the notes were given without consideration from the bank. The bank gave the stock, which thereby became the property of C. W. Cowles, or, by his consent, the property of his son. An agreement to receive the ' stock in payment of the notes would not

remove the consideration, for, until so paid, the notes. were the property of the bank, and the stock the property of the holder thereof.    C. W. Cowles having given the notes for a consideration to him, they are not accommodation notes.

III.    Our next inquiry is whether the bank is bound by the act of G. H. Cowles in withdrawing the notes from the bank, and substituting the stock therefor.    The law upon this subject is well stated in *Innerarity v. Bank,* 139 Mass. 322, 1 N. E. Rep. 282, as follows:    "While the knowledge of an agent is ordinarily to be imputed to the principal, it would appear now to be well established that there is. an exception to the construction or imputation of notice from the agent to the principal in case of such conduct by the agent as raises a clear presumption that he would not communicate the fact in controversy, as. where the communication of such a fact would necessarily prevent the consummation of a fraudulent scheme which the agent was engaged in perpetrating."  "A bank or other corporation can act only through agents, and it is generally true that, if a director who has knowledge of the fraud or illegality of the transaction acts for the bank, as in discounting a note, his. act is that of the bank, and it is affected by his knowledge.    *Bank v. Cushman,* 121 Mass. 490.    But this principle can have no application where the director of the bank is the party himself contracting with it.    In such case the position he assumes conflicts entirely with the idea that he represents the interests of the bank.    To hold otherwise might sanction gross fraud by imputing to the bank a knowledge those properly representing it could not have possessed."    See, also Newmark Bank Dep. sections 39, 41; *Mullens v. Bank,* 75 Iowa, 689, 37 N. W. Rep. 954.    The facts of this case bring G. H. Cowles clearly within the exception to the general rule.

In thus disposing of his stock in the land and stock company to the bank he was dealing for himself, and in substituting the stock for the notes he was acting for himself and for his principal, C. W. Cowles. His individual interests and those that he represented as agent for his father were antagonistic to the interests of the bank. Therefore, the bank is not bound by either his knowledge or acts, unless otherwise authorized than by his agency. The surrender of the notes was without authority, and without the knowledge of the other officers of the bank, except the cashier, who was not even consulted in the matter. It seems to us quite clear that the bank should not be bound by this fraudulent act of G. H. Cowles, and that the return of the stock was not a payment of the notes. We are more content with this conclusion from the fact that we believe that C. W. Cowles was fully informed of the necessity of changing the assets of the bank and the purpose for which the notes were to be used. It is true that, as matters have turned out, neither Dr. Cowles nor his estate have or will receive anything like full value for this indebtedness: It is also true that by the fraudulent acts of G. H. Cowles, aided, as we have stated, by C. W. Cowles, the bank has paid out the full value of these notes, to the prejudice of its creditors and shareholders.

IV. Appellant alleges and claims to have established as a fact that at and after the execution of said notes, C. W. Cowles was mentally incapacitated for making contracts. A number of witnesses were examined on this issue, and testify to facts and opinions such as are usually adduced on such a question. The evidence is somewhat voluminous, and we will not set it out nor discuss it at length. It leaves no doubt but that, in the last years of his life, the mental faculties of Dr. Cowles were greatly impaired, so much so as to

incapacitate him for transacting business. It shows that his mental impairment was gradual, but we do not think it is shown to have existed as early as January, 1887 (the time the notes were signed), nor for some time thereafter. At that time he showed no mental infirmity, save that forgetfulness of names and persons which is common to people of his age, whose business capacity is, yet, not open to question. We conclude, after a careful consideration of all the evidence, that at the time these notes were executed, and for some time thereafter, Dr. Cowles was capable of fully understanding the transaction and the effect of his acts.

V. On the submission in the District Court, the defendant guardian questioned the jurisdiction of the court, contending that an allowance of the claim could only be made by the probate court of Nebraska which had granted the guardianship. By the decease of Dr. Cowles and the appearance of the executor of his estate in this action, the guardian ceased to be a party thereto. The appellant, the administrator, does not question the jurisdiction of the District Court, and, under the record, could not successfully do so. We are not unmindful of the hardship that an affirmance works to the estate of Dr. Cowles, but it would be a greater hardship to hold, under the circumstances, that the innocent creditors and shareholders must lose the benefit of the ten thousand dollars which the bank paid out.

Our conclusion, after a careful consideration of the whole record, is that the judgment of the District Court should be *affirmed*.