## MOWER HARWOOD CREAMERY & DAIRY SUPPLY COMPANY v. BERT HILL, Appellant.

**Contracts:** EXECUTION: EVIDENCE. One who can read and signs a contract without doing so, or having it read to him is bound by its provisions, although different than he supposed. Evidence held sufficient to sustain a directed verdict for plaintiff on a subscription to stock.

*Appeal from Taylor District Court.*— HON. H. M. TOWNER, Judge.

MONDAY, OCTOBER 21, 1907.

ACTION on a contract resulted in judgment as prayed. Defendant appeals.— *Affirmed.*

*W. M. Jackson,* for appellant.

*Davis & Wells,* for appellee.

LADD, J.— Some time in 1905, plaintiff undertook to erect and equip a creamery at Lenox, Iowa, in consideration of $4,700 to be paid by forty-seven subscribers in sums of $100 each. It did so, and in this action seeks to enforce payment from defendant, whose name was the twenty-ninth on the list. The defense interposed was that his signature

was secured by fraud, in that, as is alleged, plaintiff's agent represented to him that he was procuring names of those who would take stock in a co-operative creamery, and that by signing his name to the paper he incurred no liability whatever unless he subsequently became a shareholder, that said agent concealed the printed portion of the contract, and defendant did not know or believe that he was signing a contract, but supposed he was merely expressing a willingness to take stock in the company if organized along the lines outlined by the agent.    Upon the introduction of all the evidence, the court directed a verdict for plaintiff, and the only point raised on this appeal is whether this was error.    It appeared that the papers purporting to be signed by the forty-seven subscribers consisted of three sheets.    Exhibit A was a separate paper on which the stipulations for a $3,200 creamery were printed, and it was pasted to the upper end of Exhibit B, which was folded, having a contract for a $3,950 creamery on the upper part, and plans and specifications on the lower part.    Between these two parts of Exhibit B was Exhibit C, consisting of a sheet of paper folded, on the upper part of which was a contract for a $4,700 creamery, and the lower portion blank save the signatures of the forty-seven subscribers.    By the terms of these several parts, the one adopted depended on the amounts subscribed.    That is, if $3,200 or more, though less than $3,950, Exhibit A was the one; if $3,950 or more, but less than $4,700, then Exhibit B was to be binding; and if $4,700 were subscribed the contract in force would be Exhibit C.    The defendant testified that the agent had been at his father's house two or three hours before he subscribed, and had talked with him on other occasions with reference to his signature.    That he was advised by the agent that he was trying to organize a co-operative creamery and to get a list of names to build it. That he said: " You are signing no contract and are buying no stock with us."    That the names were for a $3,950 creamery.    That he signed the paper on the agent's knee or his

own. That if there was any printed matter he did not see or know it was there, and did not for the reason he had been told there was no contract. On cross-examination he testified farther that the agent had been there two or three hours when " he pulled this out of his pocket and handed it to me. I didn't ask him one word about it. I thought I knew what it was. I took the paper as it was and put my name down. I cannot deny that the part form C was attached. I had two or three sheets of paper. I did not look at it to see what was on it. I supposed the names were there. I made no effort to see what was above my signature. I supposed it was a blank piece of paper. I can read the English language. I don't know what part of the contract was not there. Q. You signed it on what you claimed was Mr. Helm's say so? A. I took him for an honest man. Q. You did not ask him to read it? A. No, sir; he said there was nothing there to read. Q. Mr. Hill, when did you know about this A, B, and C business? A. Not until the time of their meeting. Q. I mean before you signed it? A. No, sir. Q. That is, did you not know that there were three different kinds of contracts contemplated? A. I knew only of the $3,500. Q. You had never heard of the $4,700 creamery? A. Not until the day of the meeting, or a day or two previous; that was after the contract had been signed." A brother of defendant testified that he was present and heard the representations of the agent as recited: " Q. You say there was no printed matter in sight? A. No, sir. Q. You could see there was a little more than that, more than he was putting his name to? A. There was not. Q. I wish you would show to the jury how much of it was there. Do you include all three of those printed sheets? A. I claim that much of it (illustrating) was not there. Q. You claim that the papers contained in forms A, B, and C were not there when Bert Hill signed it? A. Yes, sir; Bert had it on his knee long enough to sign it, and there was nothing to prevent him looking at it when he signed it if he wanted to."

We have set out all the evidence in support of defendant's answer, and, contrary to appellant's contention, have found none tending to show fraudulent concealment on the part of the agent. While the paper may have been folded for convenience in signing, it was placed in defendant's possession for that purpose, and nothing done to prevent him from examining it as thoroughly as he might desire. He could read and had the opportunity to do so before signing. The statement of his brother that there was no printed matter is conclusively refuted by the appearance of the names and the contract on the same sheet of paper. If the agent remarked, " You are signing no contract and buying no stock of us," this was not tantamount to saying that he was writing his name on a blank piece of paper. It was no more than an expression of his opinion or interpretation of the agreement being signed; the thought probably being that the contract was between the several subscribers, for under its terms it was not to be effective until $3,200 at least should be pledged, and only $2,900, including defendant's, was then subscribed, and the subscribers were to organize a corporation to take the creamery and themselves issue the stock. Moreover, the defendant had been advised that he was trying to organize a co-operative creamery and desired his assistance in the enterprise. To what purpose had this agent's efforts been directed in the several interviews with defendant? According to the latter, he merely wished to obtain his signature. To what? Appellant says to a blank piece of paper as indicative of his willingness to take stock in the company which should acquire the creamery.

Plaintiff's theory is that signature was written for precisely the same purpose, though without reason to think no stipulations were above his name. These stipulations were that, in event enough should be subscribed, each of the subscribers would pay the amount set opposite his name and join in the organization of a co-operation which should take over the creamery and issue the proper amount of stock to each.

Opposite defendant's were the figures "1" and "100" in columns headed, respectively, "number of shares" and "dollars subscribed." This contract was not other than defendant had every reason to understand it would be. He had concluded to assist in the construction of the creamery and signed with that purpose in mind. The agent did not represent, nor had defendant any reason to believe, that he was merely writing his name on a blank piece of paper which could serve for no other purpose than as a specimen of his penmanship. The case comes within the principle of a long line of decisions of this court that, where one who can read signs a contract, without reading it or having it read to him, he cannot be heard to complain because different than he supposed. *McCormick v. Molberg,* 46 Iowa, 561; *Gulliher v. Railway Co.,* 59 Iowa, 416; *McKinney v. Herrick,* 66 Iowa, 414; *Railway Co. v. Cox,* 76 Iowa, 306; *Wallace v. Railway Co.,* 67 Iowa, 547; *Jenkins v. Clyde Coal Co.,* 82 Iowa, 618; *Reid Co. v. Bradley,* 105 Iowa, 220; *Bonnot v. Newman,* 108 Iowa, 158; *Bannister v. McIntyre,* 112 Iowa, 600; *Insurance Co. v. Lemmon,* 117 Iowa, 691. It is not within the rule of *Grierson v. Mason,* 60 N. Y. 394, and *Olmstead v. Michels,* 36 Fed. 455 (1 L. R. A. 840), for there was no understanding that plaintiff was not to pay the amount he subscribed. Nor is our conclusion inconsistent with *Palo Alto Stock Farm v. Brooker,* 131 Iowa, 229, for in that case there was some evidence of concealment. There was no representation that the defendant was signing an instrument of a character different than that sued on, so that line of decisions has no application. Moreover, the evidence conclusively refutes all charges of fraud, for the contract binds defendant to do nothing save that which he had concluded to do; with this exception, he may have supposed the creamery was to cost $3,950, instead of $4,700. This difference was disclosed in the contract signed, and the agent, though saying he was trying for a $3,950 creamery, had made no representations with reference to not erecting a

more valuable one should enough subscribers be procured. As the defense was without support in the evidence, a verdict was properly directed.— *Affirmed.*