MARY C. WATT et al., Appellees, v. GERMAN SAVINGS BANK et al., Appellants.

**NOVATION:** Substitution of New Debtor—Surrender of Old Notes,
1   Etc. The act of a creditor in surrendering the notes of his debtor for a pre-existing indebtedness, and accepting the notes of a third party in lieu thereof, and placing said latter notes in judgment, and collecting thereon, as far as possible, works an irrevocable novation of the debt against said original debtor.

PRINCIPLE APPLIED: A savings bank, under mortgage foreclosure, became the owner of a brick plant. Immediately thereafter, Watt, who was a director of the bank, and its cashier, with four associates not connected with the bank, organized, for the purpose of carrying on said brick business, an Iowa corporation, with 250 shares of $100 each. Each organizer received 50 shares, but paid nothing therefor. The bank immediately conveyed the brick plant to the Iowa company, and the latter gave the bank its two notes: one for $7,000, secured by first mortgage on the plant, and one for some $500, unsecured. This

$7,500 represented the amount the bank had, to date, loaned on account of said brick concern.

The new Iowa company commenced to borrow of the bank. In four years, this new borrowing totaled $13,000, and the bank took a second mortgage therefor, on the plant. Watt was still cashier of the bank. Six years after the Iowa company was organized, its indebtedness to the bank totaled $40,000. At this time, Watt was president of the Iowa company, and also president of the bank. At a meeting of the stockholders of the Iowa company, Watt, its president, proposed that, if the stockholders would absolutely assign all their stock to him, he would do three things, to wit:

1. *Personally pay all the debts of the Iowa company.*

2. Reorganize said Iowa company and increase its capital stock to $50,000.

3. Deliver ten shares of the reorganized company to each of the six old stockholders of the Iowa company, he (Watt) to own absolutely the remaining 440 shares.

The stockholders accepted Watt's proposition, and assigned their stock to Watt. Watt did not reorganize the Iowa company. Evidently he discovered that to add $25,000 of capital stock would necessitate, under Iowa law, the actual paying in of $25,000 cash or its equivalent. To avoid this, Watt organized an Arizona corporation, with $50,000 capital stock, and with a name identical with that of the Iowa corporation. Watt was president of this corporation. This stock was distributed by Watt as he had agreed, though, for reasons not appearing, he divided his 440 shares (plus 10 shares voluntarily waived by one of the old stockholders) among himself and four other persons. Watt and his associate stockholders caused the Iowa company to convey *all* its property to the Arizona company, *subject to the debts of the Iowa company.* This conveyance constituted the only "payment" by the stockholders for their stock.

Watt did not *individually* pay the debts of the Iowa company. What was done was this, viz.: The Arizona company executed *its* notes to the savings bank for some $22,000, for a like amount of the notes of the old, denuded Iowa company to the bank, *and said old notes of the Iowa company were then surrendered by the bank.* The Arizona company later renewed some of its said notes to the bank, and still later, and while Watt was still president of the bank, the bank placed them in judgment. After Watt died (he being president of the bank until his death), the bank sold the Arizona plant under these judgments, and realized $4,500. All meetings of the directors and stockholders of

both the Iowa and Arizona corporations were at all times held at and in the directors' rooms of the bank.

After the bank received the notes of the Arizona company in lieu of the notes of the Iowa company, it never made any claim, either in the reports of its examining committees or in its official reports to the state or in any other manner, that Watt, its president, was owing the bank on his said promise to pay the debts of the Iowa company, until after the death of Watt, when it filed against his estate a claim of some $23,000, based upon old notes of the Iowa company accruing prior to the time Watt made his agreement to pay said debts.

*Held*, the act of the bank (1) in accepting the notes of the Arizona company in lieu of the notes of the Iowa company, (2) in surrendering the notes of the Iowa company, and (3) in placing the same in judgment and selling the plant of the Arizona company thereunder, worked a complete novation,—irrevocably cancelled the debt of the Iowa company to the bank on said notes so surrendered.

**CONTRACTS:** Validity—Non-Literal Performance—Effect. One who performs his contract undertaking in a manner acceptable to those to whom performance is due, may not later assail the validity of his undertaking, on the ground that he, himself, did not literally perform his said undertaking as he had agreed.

**CONTRACTS:** Performance—Substantial Performance. *Substantial* performance of a contract is, ordinarily, all that is required.

PRINCIPLE APPLIED: See No. 1. *Held*, the act of Watt, in organizing a new and foreign corporation, with the increased capital stock, and his action with reference thereto, were a substantial performance of his agreement to reorganize the Iowa corporation and to increase the capital stock thereof, etc.

**CONTRACTS:** Construction—Subject-Matter—Scope and Extent of Obligation. An enforceable agreement to pay the debts of a financially embarrassed *corporation* does not embrace the *personal* notes of the officers of said corporation given for money borrowed by said officers for the sole use and benefit of the corporation.

**GUARANTY:** Discharge of Guarantors—Guaranty of Debt—Novation of Debt—Effect. Liability upon the guaranty of a debt ceases upon the subsequent novation of the guaranteed debt.

PRINCIPLE APPLIED: A bank was a heavy holder of the obligations of a financially embarrassed corporation. Certain parties were induced to give the bank their personal guaranty of the payment, to a stated amount, of the obligations of the

corporation. A few days later, a new corporation was organized, which took over all the property of the old and embarrassed corporation, and which new corporation executed to the bank *its* notes for and in lieu of the debts of the old corporation, *which notes* the bank accepted, and surrendered the obligations held by it against the old corporation. *Held*, the conduct of the bank worked a novation of the guaranteed debt, and released the guarantors.

CONTRACTS: Consideration—Guaranty in Consideration of Indefinite Extension of Debt. A guaranty of a debt, in consideration of *such extension of time as the holder of the debt might elect to give the debtor*, is not supported by a sufficient consideration, even though the said holder did forbear collection for a time.

CORPORATIONS: Corporate Debts—Liability on Unpaid Stock. Extending credit to a corporation, *with knowledge that the corporate stock has been issued without payment therefor*, precludes the one so extending credit from pursuing the stockholders on their unpaid stock subscriptions.

CORPORATIONS: Stock—Issuance—Consideration. If consideration for an issuance of corporate stock would exist if the stock were issued to one person, such consideration equally exists for its issuance to another, to whom the first party caused the corporation to issue it.

BANKS AND BANKING: Imputing Knowledge of Director to Bank. It may not be *presumed* that a bank director conveyed to his bank knowledge acquired by him

(a) In professional confidence as attorney for a client other than the bank, or

(b) In transacting, as director of another corporation, business in conflict with that of the bank.

PRINCIPLE APPLIED: A bank was a large creditor of an embarrassed corporation. Several directors of the bank were directors of the corporation. The stockholders and directors of the corporation conceived the plan of organizing a *new* corporation, to take over and merge the old corporation, and the plan of having the new corporation issue its stock to them for no consideration other than the receipt by the new corporation of the assets of the old corporation. The plan was carried out. · The attorney who drew the necessary papers to effectuate the plan was a director of the bank. The new corporation became insolvent, and the bank lost heavily. The bank then sought to hold the stockholders of the new corporation, on the plea that

they never paid for their stock. On the issue whether the bank extended credit to the new corporation *with knowledge that the stockholders had not paid for their stock,* held that such knowledge might not be imputed to the bank (a) from the knowledge of said attorney, nor (b) from the knowledge of those who were directors both of the bank and of the said corporation.

**BANKS AND BANKING:** Knowledge of Director Knowledge of Bank. Principle recognized that a bank is held to know and *remember* what its directors learn while acting as such.

**FRAUDS, STATUTE OF:** Debt of Another—Oral Promise. An *oral* promise to pay a written obligation which is, in form, *the sole obligation of another,* is not within the statute of frauds, when it is made to appear that said obligation is, in fact, the personal obligation of the oral promisor, and for his sole benefit.

**BANKS AND BANKING:** Officers—Misapplication of Funds. The president of a banking partnership who, *to further his own personal interests,* causes loans to be made by the bank to a known insolvent concern, is liable to the partnership for the resulting loss.

**BANKS AND BANKING:** Officers—Liability. A bank president who, at a time when his bank had no money with which to make a loan, caused his bank to issue, without consideration, its certificate of deposit to another bank, which thereupon actually furnished the money for the loan, may not defend an action against him by the bank for recoupment of the loss, on the ground that his bank *has not yet paid said certificate.*

**EVIDENCE:** Conclusions—Understanding of Witness. The "understanding" of witnesses that a savings bank was the owner of and carrying on a business prohibited to such bank is an inadmissible conclusion.

**EVIDENCE:** Declarations of One Having Conflicting Interests. Declarations of the deceased officers of a savings bank that the bank was owner of and carrying on a business prohibited by law to the bank are inadmissible, when such declarations are distinctly hostile to the interests of the bank.

**BILLS AND NOTES:** Execution and Delivery—Failure to Read— Effect. One who can read, and has an opportunity to read, and does not read, may not assert lack of knowledge of the contents of a note signed by him.

**BANKS AND BANKING**: Directors—Scope of Authority. Indi-
vidual directors of state and savings banks, *unless specially
authorized by the board of directors*, have no power to bind
their bank to the discharge of obligations not connected (a)
with the management of the bank's ordinary business, or (b)
with the receipt and payment of deposits; and this is especial-
ly true when the director has interests adverse to those of
the bank.

*Appeal from Polk District Court.*—W. H. McHENRY, Judge.

DECEMBER 21, 1917.

REHEARING DENIED APRIL 2, 1918.

THE facts are stated in the opinion. All parties ap-
peal.—*Affirmed.*

*Parker, Parrish & Miller, Halloran & Starkey, O. M.
Brockett,* and *C. L. Nourse,* for appellants.

*Sullivan & Sullivan, D. M. Kelleher, J. G. Myerly, Par-
sons & Mills, A. A. McGarry,* and *Carr, Carr & Evans,* for
appellees.

LADD, J.—Many cases pending in the district court were
consolidated for the purposes of trial. As the pleadings
cover 164 pages of the otherwise voluminous abstracts, the
issues will be better understood if separate-
ly stated in disposing of specific claims. A
brief history of the enterprises involved
seems essential by way of introduction. The
German Savings Bank was organized as such,
with a capital of $50,000, in 1892. A partnership known as
Newman Bros., or Newman Brick Company, became indebted
to the bank, and, on October 3, 1896, executed a mortgage
covering its brick plant, including brick on hand and any
additions thereto, to E. C. Kelly, as trustee for the bank, to
secure the payment of $5,432.51 then owing said bank. A
receiver was appointed for the bank in January, 1897, but it

was reorganized in June following.. A perusal of the opin-
ion in *German Sav. Bank v. Des Moines Nat. Bank*, 122 Iowa
737, in connection with the record in this case, discloses the
fact that the officers of this bank could not be made to un-
derstand Section 1869 of the Code. ·James Watt succeeded
J. W. Geneser as cashier, March 27, 1899, and was elected a
director in June of the same year. He continued as cashier
until elected president of the bank, in November, 1906, and
held this office until his departure from this life, in April,
1911. He had been a retail and wholesale grocer, prior to
his connection with the bank, and had never been engaged
in or connected in any manner with the manufacture of
brick or other building material. The business of the bank
was prosperous under his management, its capital stock
doubling, deposits steadily increasing from about $100,000
to over $1,000,000, with remunerative dividends; and, upon
its consolidation with the Des Moines National Bank, in
December, 1914, the value of its stock was computed at $125
per share, with the prospect of a dividend on bills receiv-
able retained by it. This much is said in explanation of loans
made in the promotion of the brick plant, which it seemed
impossible for it to let go of, and on which over $40,000
were lost. The mortgage to Kelly, as trustee, was assigned
to the bank, by it foreclosed, and the brick plant sold under
special execution, the bank acquiring title under sheriff's
deed in April, 1902. On May 24th following, a corporation
known as the Granite Brick Company was organized under
the laws of this state, with capital stock of $25,000, divided
into 250 shares. Of these, 50 shares were issued to each of
the organizers, who became the directors of the company, to
wit: A. Newman, C. Newman, B. M. Newman, John Keefner,
and James Watt. A. Newman became president of the com-
pany, Keefner, secretary, and Watt, treasurer. The latter
only was connected with the bank. Nothing was paid for
these shares. The bank conveyed the real estate and machin-.

ery of the brick plant by deed, and the personal property by
bill of sale, to the new company; and the latter, in consider-
ation therefor, executed two notes, one for $543.47, and an-
other for $7,000, to the bank, and gave a mortgage on said
property to secure the payment of the last-named note.   On
January 19, 1906, a second mortgage was executed to the
bank, securing "$13,000, as evidenced by the several notes of
the Granite Brick Company and owned by the said German
Savings Bank." The first of these mortgages was promptly·
recorded, but the last was not filed for record until May 24,
1912.   The indebtedness of the Granite Brick Company to
the bank gradually increased, as it had under partnership
management, and, on December 9, 1908, amounted to about
$34,000, besides the current bills owed to others, aggregating
$6,000.   Difficulties appear to have been experienced in ob-
taining the approval of the state bank inspector of so large
an amount loaned to one debtor, and, early in March, 1909,
another corporation, bearing the same name, was organized
under the laws of Arizona, with a capital stock of $50,000.
It was to begin business when its articles were filed, which
was on the 8th of the same month.   Thereafter, the Granite
Brick Company, organized under the laws of Iowa, which
will hereafter be referred to as the Iowa Company, trans-
ferred all its property to the company of the same name, or-
ganized under the laws of Arizona, hereafter to be desig-
nated the Arizona Company.   The latter took over the prop-
erty of the Iowa Company, subject to its debts.   The Arizona
Company was no more successful than its predecessor, and
its property was sold, on foreclosure of the two mortgages
mentioned, after Watt's death—the company's realty for
$1,500, and its personalty for $534.   Through redemption un-
der another of the bank's judgments against the Arizona
Company, a further credit of $2,500 was entered for the
property.   The design of the German Savings Bank in these
suits, consolidated, is to recoup, from others than the two

insolvent companies, the losses consequent upon credits extended to them, and to ascertain who, other than the Arizona Company, is liable for the repayment of money borrowed from the Des Moines National and the Bevington Bank.

I. On May 21, 1912, the German Savings Bank filed its claim, duly verified, against the estate of James Watt, deceased, for $27,712.03, based on six promissory notes, said to have been executed by, or evidencing debts of, the Iowa Company to said bank, prior to December 9, 1908, and a proposition of Watt's and a resolution of acceptance by the stockholders of said company. Four of these notes were signed by the Iowa Company. Of these, one for $3,048.97 was proven to have been paid. Another was for $14,068, dated May 31, 1907; still another, for $7,000, bearing the same date; and the fourth one for $2,105.68, dated May 28, 1908. All were payable on demand. Two of the notes were signed by John Keefner, August Newman, and A. H. Newman, but not by the Iowa Company, one being for $2,800 dated December 22, 1906, and the other, for $2,500, dated December 22, 1907. Both are payable on demand. The alleged liability of Watt's estate is based on a proposition made by him on December 9, 1908, to the stockholders of the Iowa Company, he then being president, and the owner of 10 shares of stock, in words following:

"It appearing that the company was badly involved, and unable to dispose of its property at a price sufficient to pay all the indebtedness, Mr. Watt, president of the company, submitted the following proposition, which was adopted by a unanimous vote of all present:

" 'Whereas it appears from an investigation of the affairs of the Granite Brick Company that it is indebted to the German Savings Bank in the sum of $34,000, and in addition thereto on current bills, to the amount of about $6,000,

" 'Now, therefore, at this special meeting of the stock-

holders of the said Granite Brick Company, in which all the stockholders are personally present, it was resolved that there be a reorganization of said Granite Brick Company; that the capital stock thereof be increased to fifty thousand dollars; that James Watt agrees to pay off all the indebtedness of said Granite Brick Company, if each of the stock holders will transfer to him all their stock in said Granite Brick Company, and it being deemed advisable so to do, each of the stockholders do transfer to James Watt their stock in the Granite Brick Company, the same to be his absolute property.   In consideration therefor, the said James Watt agrees to pay all the indebtedness of said Granite Brick Company of all kinds and character; to increase the capital stock of said Granite Brick Company to fifty thousand dollars ($50,000.00), and deliver to each of the stockholders herein named the following shares in the reorganized company:

" 'To August Newman ....................10  shares
To Miss Rose Newman and brother..........10  shares
To Arthur Newman......................10  shares
To H. B. Hawley.......................10  shares
To Benson & Marxer ...................10  shares
To John Keefner.......................10  shares
To James Watt........................440  shares

" 'Said stock to be fully paid up when issued.   James Watt further agrees, with reference to the 440 shares owned by him in the reorganized company, that he will sell any portion of said 440 shares to any of the foregoing stockholders at the actual value of said shares.   The said above-named stockholders to have ten days' option whether or not they will purchase any portion of said 440 shares, on the above condition, from the ninth day of December, 1908.' "

The executors of the estate, among others, interposed the defenses:   (1) That the proposition and resolution were abandoned and never carried out; and (2) that the Arizona

Company executed its notes to the German Savings Bank, which accepted same in satisfaction of the Iowa Company's notes, and cancelled and surrendered the latter. The president and the secretary (Keefner) were appointed a committee to carry out this arrangement, but the secretary did not act. The president proceeded so to do, and

2. CONTRACTS:
validity: non-
literal per-
formance: ef-
fect.

neither he nor the executors of his estate is in a situation to plead the invalidity of the resolution on the ground that Mrs. Keefner, part owner of ten shares in the Iowa Company, was not present at the stockholders' meeting, especially in view of the circumstance that neither she nor any other ever raised objection on that ground. Nor

3. CONTRACTS:
performance:
substantial
perform-
ance.

was there any substantial variance from his undertaking in organizing a new company, rather than increasing the capital stock of that existing. The same result was accomplished, and accepted as compliance with the terms of the resolution by all those interested except the Keefners; and, having availed himself of all the advantages of the resolution, neither he nor his representatives should be permitted to assail its validity, on the ground that he did not perform his part precisely as he had promised. Substantial performance was all that was required; and, as those adversely interested are content with what he did, neither he nor his representatives may evade his further obligations, if any there are. On March 4, 1909, he, with others, organized the Arizona Company, with capital as stipulated, caused the conveyance by the Iowa Company of all its property to the Arizona Company, subject to the Iowa Company's debts, and also caused the shares of stock therein to issue as follows: August Newman, 10 shares; Rose Newman and brother, 10 shares; John and Jessie Keefner, 10 shares; Arthur Newman, 10 shares; Benson & Marxer, 10 shares; James Watt, 88 shares; J. C.

O'Donnell, 88 shares; L. J. Klemm, 88 shares; H. N. Hawley, 98 shares; J. O. Wells, 88 shares.

Each of the shareholders in the Iowa Company, except Mr. and Mrs. Keefner, received the number of shares stipulated in the resolution. Keefner concluded to have nothing further to do with the concern, and therefore did not receive the certificate of 10 shares prepared for himself and wife. The shares reserved to Watt were issued to himself and the four others last named. That which was done was a substantial compliance with Watt's undertaking, though he appears to have been compelled to organize a new company outside of the state, probably in order to avoid a recent statute exacting the full payment of all stock issued by any corporation organized for pecuniary profit within the state. The evidence, however, is conclusive in sustaining the other defense. The Arizona Company, on May 31, 1910, executed its promissory note for $13,000, for and instead of the $14,068 note heretofore mentioned, and this latter note was renewed on October 31, 1911. The Arizona Company executed its promissory note for $7,000 on May 3, 1910, for and instead of the note of like amount of the Iowa Company, and renewed it on October 31, 1911. Said Arizona Company executed its note of $2,105.68 for and instead of the note of like amount of the Iowa Company. Upon receipt thereof, the notes of the Iowa Company were surrendered, and subsequently the bank brought suit against the Arizona Company on its notes so taken, and obtained judgment thereon. That this amounted to a complete novation of the indebtedness cannot well be questioned. *Michigan Stove Co. v. A. H. Walker & Co.,* 150 Iowa 363; *Foster v. Paine,* 63 Iowa 85.

"Where the note of a third person is taken for a preexisting debt, which is surrendered up, and the holder of the note thus taken elects to sue, and merge the note into a judgment, he will be estopped to say that he did not take

the new note in substitution for, and in extinguishment of, the old debt, especially while the judgment so taken remains, so far as appears, a valid, enforceable security. After one has taken a second or substituted note, and surrendered up the original, and has cut off all defenses to the note so taken, either by transferring it to an innocent holder, or by himself putting it into a judgment, he will be estopped from taking another judgment against the original debtor on the obligation theretofore surrendered up." *Dick v. Flanagan,* 122 Ind. 277 (23 N. E. 765).

See *Hooker v. Hubbard,* 97 Mass. 175; *Tysen v. Sommerville,* 35 Fla. 219 (17 So. 567); *In re Petition of Becken,* 93 Mich. 342; 29 Cyc. 1137.

Neither in the reports of its examining committee to the state auditor nor otherwise did the bank assert any claim against Watt on these notes based on the resolution (though required to state liability of directors as borrowers and as endorsers), or otherwise. There was a complete novation of the indebtedness, and the claim, in so far as based on the four notes, was rightly denied. According to Keefner, the notes signed by him and August and A. H. Newman were given for money loaned by the bank to the Iowa Company, and were carried on the books of the latter as bills payable. But this did not constitute these notes obligations of that company. It did not sign the notes. There is no evidence in the record that the bank ever looked to it for payment. They were charged off the books of the bank as of doubtful value. Though, upon satisfaction of the notes, the makers might fix liability for repayment on the company, surely the bank is not in a situation to establish a claim based solely on these notes on the mere showing that the money was loaned on the credit of the officers of this company individually, though for the use of the company. The claim was rightly rejected.

4. CONTRACTS: construction: subject-matter: scope and extent of obligation.

II. On March 4, 1909, Watt, Hawley,
Klemm, O'Donnell, and Wells each executed
to the German Savings Bank a separate in-
strument in words following:

**5. GUARANTY:** discharge of guarantors: guaranty of debt: nova-tion of debt: effect.

"This agreement made and entered into
this 4th day of March, A. D. 1909, by and between Jesse O.
Wells, party of the first part, of Des Moines, Iowa, and Ger-
man Savings Bank, party of the second part, of Des Moines,
Iowa, witnesseth:

"Whereas the party of the first part is a stockholder in
a corporation known as Granite Brick Company, located and
doing business in the city of Des Moines; and

"Whereas said Granite Brick Company is indebted to
the German Savings Bank, party of the second part, and is
desirous of obtaining an extension of time on said indebted-
ness;

"Now, therefore, in consideration of such extension of
time as may be given to said Granite Brick Company by the
German Savings Bank, and for the purpose of obtaining such
extension, and in consideration of one dollar in hand paid,
the party of the first part does hereby guarantee the payment
to the German Savings Bank by the Granite Brick Company
of the sum of $4,000 of the said indebtedness owing by the
Granite Brick Company to the German Savings Bank, with
interest thereon at such rate as may be agreed upon between
said brick company and said bank. This guarantee is in-
tended as a guarantee of $4,000, other than the like sums the
payment of which is guaranteed to said bank by the other
stockholders of said brick company.

"The party of the first part does further agree to waive
demand, notice and protest, and does ratify and consent to
any extension or extensions of time which may be given by
said party of the second part to said Granite Brick Com-
pany, upon any of its indebtedness, and does further agree
to endorse the notes of said Granite Brick Company and any

renewals thereof, if requested by said bank to do so, for the amount above guaranteed. Witness my hand the day and year above written."

Claim based thereon for $4,000 was filed against the estate of Watt on May 13, 1912; and on December 12, 1913, actions were begun on like instruments against the other parties executing the same. Two of the defenses interposed are common to the five suits, to wit: That (1) this guaranty was of the indebtedness of the Iowa Company, and all of such indebtedness has been discharged by the execution of notes of the Arizona Company, or otherwise satisfied; and (2) the consideration for the execution of the guaranty was never performed. Taking up these defenses in the order stated, it is to be said that, at the time these papers are presumed to have been signed, i. e., their date, March 4, 1909, the Arizona Company had not been organized. Though it may have been contemplated, it was not indebted to anyone, nor had it begun to do business. It could not lawfully do so until its articles of incorporation were recorded in Arizona, and this did not happen until four days later, and it acquired no property until conveyed to it by the Iowa Company. Certificates of stock were not issued until the 20th of that month. That the indebtedness of the Iowa Company was contemplated finds confirmation in the testimony of Wells and Klemm. The former testified that Watt stated that the paper of the Granite Brick Company had been or might be criticised, and asked him to sign it, and said that he would have some stock issued to him as collateral security, which would be ample. Wells had not been a stockholder in the Iowa Company, and was not then advised concerning the organization of a new corporation. Surely he had no reason to suppose, then, that he was undertaking to guarantee indebtedness of a corporation to be organized thereafter, and to be by it created, but rather, one in existence, of which he knew, and an existing debt of the latter's. Klemm testi-

fied that Watt and O'Donnell requested him to sign the guar-
anty, and that O'Donnell said that there was "some comment
on the Granite Brick Company's paper there, and they
wanted to make a good showing in regard to the committee
on examination." Both witnesses swore that they were
told that, if they signed the paper, the bank would take
care of it. Hawley was not called as a witness, and Watt
and O'Donnell are dead. This evidence indicates that a
temporary purpose only was to be subserved, i. e., securing
the indebtedness of the Iowa Company until it might be
cared for or taken over by the Arizona Company, rather
than that the obligations were to secure the debts of a cor-
poration thereafter to be organized. More-

6. CONTRACTS :
consideration :
guaranty in
consideration
of indefinite ex-
tension of
debt.

over, the consideration recited in the guar-
anty is "such extension of time as may be
given to said Granite Brick Company by the
German Savings Bank, and for the purpose
of obtaining such extension." No extension was ever ap-
plied for or granted, for the reason, manifest in the record,
that the Arizona Company discharged the obligations of
the Iowa Company by executing its notes instead, or pro-
curing money elsewhere to satisfy the same. No other con-
sideration was shown. True, the bank forebore from en-
forcing collections for a while, and took the Arizona Com-
pany's notes in lieu of those of the Iowa Company; but this
was not in pursuance of a promise other than may be in-
ferred for such time as it might elect, and this would not
constitute valuable consideration, as it imposed no obliga-
tion on the bank to forbear for any specified length of time.
*Strong v. Sheffield*, 144 N. Y. 392; *Gates v. Hackethal*, 57
Ill. 534; 9 Cyc. 345. For these reasons, the court did not
err in dismissing the claim on the guarantee against the es-
tate of Watts, or the suits against the other signers thereof.

III. Shares in the Arizona corporation were issued to
the persons signing the guaranty considered in the preceding

paragraph. These shares were not paid for, otherwise than by surrendering stock in the Iowa corpora-

7. CORPORA-
TIONS : cor-
porate debts :
liability on
unpaid stock.

tion. As part of the claim against the estate of Watt, and as a separate count in each petition filed in the actions on the guaranties, face value of the shares, alleged not to have been paid for, is sought by the German Savings Bank. The latter appears to have been a judgment creditor of the Arizona Company, which is without property, and, as is contended, 88 shares of stock each were issued to Wells, Klemm, O'Donnell, and Watt, and 98 shares to Hawley. The face value of this stock was $100 per share. Several defenses are interposed, which may be separately considered.

(a) Each of said stockholders contends that there was a consideration, in that stock in the Arizona Company was issued in payment of the property of the Iowa corporation, and that this was in accordance with the ar-

8. CORPORA-
TIONS : stock :
issuance : con-
sideration.

rangement between the stockholders, for shares were issued by the Arizona Company as per the requirement of the resolution of the stockholders of the Iowa Company, save that, of the 440 shares to be issued to Watt, 88 were issued to him, and 352 shares distributed to the other four defendants. Surely, the assumption by Watt of all the indebtedness of the Iowa Company was consideration for the issuance of the 440 shares of stock; and if these were by his consent issued to others, it is not perceived wherein there is room for complaint by the German Savings Bank. If Watt was entitled to the 440 shares, he might dispose of them as he pleased, and the circumstance that they were issued direct to his associates, instead of to him and then assigned to them, can make no difference. Moreover, the new company, according to a resolution of the stockholders,' issued all its stock, as stated, in payment of the property and assets of the Iowa Company, "subject to the debts of the Iowa corporation." Sure-

ly, these shares of the capital stock were not issued without consideration.

(b)· In any event, the German Savings Bank is not in a situation to assert the claim for unpaid portions of the face value of this stock, if not fully paid for; for that credit was extended to the Arizona Company with knowledge that the stock was issued without other consideration than stated.

Recovery òf a creditor from a stockholder for unpaid subscription for stock, or, in event of·payment in property, for the undervaluation, is allowed on the theory that a fraud has been practiced on the creditor, who has the right, in dealing with the corporation, to assume that its stock is fully paid; and, of course, there can be no recovery where the creditor deals with full knowledge that payment there-for has not been made. *State Trust Co. v. Turner,* 111 Iowa 664.

As early as October 30, 1908, the directors of the bank were informed in a report made by Watt to them that a change would be made in the management of the Granite

9. BANKS AND BANKING: imputing knowledge of director to bank.

Brick Company, and that its prospects were very bright. A director of the bank, Jerry B. Sullivan, prepared the resolution heretofore set out, in pursuance of which the Arizona Company was organized, and which recited that shares of stock were to be issued without other consideration than therein recited. It does not appear that he was acting as attorney for the Iowa Company in preparing the resolution. Certainly, he did not represent the bank in connection with what he did; and, for this reason, the latter is not presumed to have been informed by him of what he ascertained in that transaction. What he learned was not acquired in the course of his employ-. ment, or in the performance of some duty owed to the bank, as agent or director, and therefore he was under no obligation to communicate to it anything he ascertained. *Hum-*

*mel v. Bank of Monroe,* 75 Iowa 689; *Caffee v. Berkley,* 141 Iowa 344; *Anderson v. Kinley,* 90 Iowa 554; *Findley v. Cowles,* 93 Iowa 389; *Goodbar, White & Co. v. Daniel,* 88 Ala. 583 (16 Am. St. 76). The general rule is that the principal is bound by the knowledge of the agent, and that rule is based on the duty of the agent to communicate to the principal his knowledge with reference to the subject of the negotiation, and the presumption that he has performed that duty.

There are exceptions to this rule, however, as where to disclose information to a principal would violate professional confidence, or be inimical to the agent's interest, or where the circumstances are such that, in all reasonable probability, the principal was not informed by the agent. Sometimes notice is constructive, as when the principal is unconnected with a previous transaction in which the information is obtained, and "where the transaction in question closely follows and is intimately connected with a prior transaction, in which the agent was also engaged, and in which he acquired material information, or where it is clear from the evidence that the information obtained by the agent in a former transaction was so precise and definite that it is or must be present to his mind and memory while engaged in the second transaction, then the foregoing requisite (general rule) becomes inapplicable." 2 Pomeroy on Equity Jurisprudence (3d Ed.), Section 672.

See *Findley v. Cowles,* 93 Iowa 389; *German Sav. Bank v. Des Moines Nat. Bank,* 122 Iowa 737; 2 Thompson on Corporations (2d Ed.), section 1626; *Hummel v. Bank,* supra; *Lea v. Iron Belt Merc. Co.,* 147 Ala. 421 (119 Am. St. 93); Mechem on Agency (1st Ed.), Sections 721, 770, Note 2.

Knowledge of the method pursued in the organization of the Arizona Company, then, may not have reached the bank through Sullivan, who prepared the resolution of the

directors of the Iowa Company on which the organization
of the Arizona Company was based, nor, owing to conflict-
ing interests, through the directors of the latter company,
even though directors of the bank at the same time. But
the headquarters of the two companies, throughout their ac-
tive existence, were at the bank. All meetings of their di-
rectors were held in the directors' room of the bank. Much
of their business was there transacted. The stockholders
of the Iowa Company were met there when Sullivan pre-
pared the resolution on which the incorporation of the Ari-
zona Company was based, and when it was adopted. The
incorporators met there to adopt the articles of incorpora-
tion of the Arizona Company and elect its officers; and in
the same month, March 30th, what had been done was re-
ported to the board of directors of the bank at its regular
meeting, as in the minutes thereof appears the following:

"President Watt reported regarding the reorganization
of the Granite Brick Company. After a thorough discus-
sion of same, Mr. Wilcoxen congratulated the officers and
directors for their part in the reorganization of the Granite
Brick Company, stating that, in his opinion, the paper of
the company is first class, and is as good as any paper in
the bank. Mr. Wilcoxen presented and moved the adoption,
and seconded by Mr. Wells, the following resolution:

" 'Whereas the president and cashier of this bank have
been instrumental in the reorganization of the Granite
Brick Company, with a view of securing its indebtedness to
the German Savings Bank, by accepting from five different
individuals the guaranty of each for the sum of four thou-
sand dollars, in all amounting to twenty thousand dollars,
we commend and approve their action. Unanimously
adopted.' "

These circumstances leave no doubt as to the bank's
knowledge. If Watt reported truthfully, as, in the absence
of anything to the contrary, he must be presumed to have

done, and if the organization of the company was thorough-
ly discussed, as stated, it is hardly conceivable that the
basis on which stock was issued could have been overlooked,
especially since Sullivan, who was as well informed on this
subject as Watt, was present, and, so far as any professional
obligation as attorney was concerned, was entirely free to
discuss the matter. Had the board of directors not been
aware that the funds of the company had not been increased,
probably sole emphasis would not have been placed on the
guarantees, as rendering the credits of the bank sound.
Nothing to the contrary appears in the record, and we find
that the bank was informed, long before extending credit to
the Arizona Company, of the consideration, such as it was,
for the issuance of the several blocks of its
stock. The directors of a bank constitute
its governing body. As such, they superin-
tend and control all its affairs, and in the
fullest sense represent the bank; and notice
to the board was notice to the principal, regardless of hav-
ing agencies through which to transact its business. *Bank
of Pittsburg v. Whitehead, Sproul & Co.,* 10 Watts (Pa.) 397
(36 Am. Dec. 186), and valuable note.

10. BANKS AND
BANKING:
knowledge of
director
knowledge of
bank.

As said in *Toll Bridge Co. v. Betsworth,* 30 Conn. 380,
"what the directors know regarding matters affecting its
interests, the corporation knows." The bank, once informed,
will not be permitted to forget, upon some change in its
directorate. *Mechanics' Bank v. Setons,* 1 Pet. (U. S.) 298.

Our conclusion is that recovery for alleged unpaid sub-
scriptions for stock was rightly denied.

IV. The Bevington Bank, a partnership, composed of
Watt, O'Donnell, Klemm, T. F. Kelleher, and J. B. Sullivan,
filed its claim against the estate of Watt on May 9, 1912,
based on two promissory notes: one for
$5,000, dated December 21, 1908, executed by
the Granite Brick Company, payable to said
bank, and endorsed by James Watt; and the

11. FRAUDS,
STATUTE
OF: debt of
another: oral
promise.

other for $10,000, dated May 21, 1909, executed by the Granite Brick Company, and payable to said bank. The alleged liability of Watt on this last note is predicated: (1) On Watt's alleged promise to endorse the note; (2) on the fact that the loan was for his benefit, and he promised to pay the note as an individual undertaking; (3) on the fact that he is liable to pay same, under the arrangement of December 9, 1908, being his proposition and the resolution of acceptance of the stockholders of the Granite Brick Company; and (4) on the fact that Watt knew, at the time, that said Granite Brick Company was insolvent, and, notwithstanding this, caused the loan to be made to it for his own use and benefit, and without the knowledge or consent of other partners in the Bevington Bank. The executors, for answer, pleaded that the German Savings Bank was, in fact, owner of and operating the brick plant; that the incorporation of the companies and operation of the brick plant in their names was a mere subterfuge, to evade the statute forbidding a savings bank from engaging in any other business; and that the loans were really those of the said bank, and it only was liable thereon; and otherwise denying liability on the $10,000 note. The parties to this partnership, known as the Bevington Bank, entered into written articles whereby the capital was to be $3,000; Watt to act as president; Klemm, vice-president; O'Donnell as cashier; and Joseph A. Stamen, assistant cashier.

Business was begun July 1st following. The testimony in connection with the correspondence of Watt and O'Donnell with the assistant cashier in charge of the bank leaves no doubt that they exercised a minute control of all matters connected with the bank, and that the assistant cashier merely followed their directions in carrying on its business. Neither Sullivan nor Kelleher ever had any interest in either the Iowa or the Arizona Company, and did not take an ac-

tive part in the management of the Bevington Bank, and
were never consulted about its loans. Indeed, the bank, lo-
cated in the village of Bevington, which contained a popula-
tion of about 150 people, and was situated 35 or 40 miles
from Des Moines, made no loans, except these two to the
Brick Company, elsewhere than in Bevington and its im-
mediate vicinity. No account was kept with other than the
German Savings Bank. On December 21, 1908, when the
$5,000 note was taken, it had on hand $1,885.99, and with
the German Savings Bank, $2,348.82, or $700 less than the
loan made. Nevertheless, O'Donnell sent the note of $5,000,
signed by the Iowa Company and endorsed by Watt, with
instructions as follows:

"In lieu of this note, please send us your draft for this
amount. Carry the note in your bills receivable, and if you
have not sufficient money on hand at this bank to take care
of it, you send us your time certificate, as you have hereto-
fore, and with notes endorsed, and attach to this certificate
as collateral security."

A certificate for $5,000 was issued accordingly, and the
note was accepted in that amount, and credit to the Brick
Company was entered by the German Savings Bank, check
having been issued to it and endorsed over. On May 21,
1909, when the Arizona Company executed its note for $10,-
000 to the Bevington Bank, said bank had on hand $1,754.27,
and had overdrawn its account with the German Savings
Bank $396.91, and it was already indebted to that bank, ex-
clusive of the overdraft, in the sum of $24,200.

The assistant cashier was in Des Moines on the 19th or
20th of May previous, and testified that Watt then said to
him:

"'I want to borrow $10,000, and I want to borrow it
from the Bevington Bank.' I told him I thought, if we had
$10,000 to loan, we could make better use of it by loaning the
money around Bevington, to people that might become pros-

pective customers, etc., and he said, 'Well, that is all right too,' but he says, 'I want to make the loan.' And I told him then that it might—that he would not have any trouble getting the money in Des Moines at some of the other banks; but he said he didn't want to do that, and said he wanted to use the money for the Granite Brick Company. He said that, 'Of course,' he said, 'you know I own the Granite Brick Company, and of course I have with me Mr. O'Donnell, Mr. Klemm,' and he mentioned a few more people; but he said 'They are just there,' he says, 'to fill the offices.' He said, 'They don't have any particular interest in the matter, but the note will be signed by Mr. O'Donnell and Mr. Klemm for the Granite Brick Company.' And so we let the matter go; and a day or two later, Mr. O'Donnell came down with a $10,000 note, and we gave the German Savings Bank—

"Mr. Kelleher: Was there anything in the talk had between you and Mr. Watt in reference to whether you had the money at Bevington to loan—$10,000?

"A.    Yes, I told him that we didn't have the money. 'Well, now,' he says, 'that is all right,' he says, 'we will fix that,' he says, 'all the money you loan me, the German Savings Bank will loan you back, just as much money as what you loan me.' He said the note would be made out on demand, and that he expected that, in a week or two, at the highest in about three weeks, to pay this note, as he was on a deal then to turn some property, and as soon as he had the deal closed, he would have money enough to pay this $10,000 back. A day or two later, Mr. O'Donnell came down to Bevington with a $10,000 note, and that is the note the reporter has identified as Exhibit 19."

He had no information other than that derived from Watt that such a note was being drawn, until O'Donnell brought the $10,000 note, signed by the Arizona Company, and payable on demand to the Bevington Bank on May 22d. The transaction, however, had been entered on the books

of the German Savings Bank the day previous. A deposit was made to the credit of the "Pressed Brick Company" in that amount in the form of a check, and a charge of $10,000 to the Bevington Bank was entered on its books. However, the note was accepted by the assistant cashier the following day, and the certificate of the Bevington Bank to the amount of $10,000 issued to the German Savings Bank. If a check for that amount was issued, the record does not so indicate, but rather that the transaction was a mere matter of bookkeeping. The loan would not have been made by the assistant cashier but for the circumstances recited. At that time, there was an overdraft of the Iowa Company on the German Savings Bank of $6,150.97. This, of course, was extinguished, leaving a balance of $3,856.53, $1,708.38 of which was applied in satisfaction of the accrued interest on various notes of the Iowa Company to the bank. In December, 1908, Watt had directed the manager of the Iowa Company not to draw any more checks on the German Savings Bank, and shortly thereafter sent for and obtained all the books of that company; and on December 22d, the day after the $5,000 note was given, an account was opened with the "Granite Pressed Brick Co.," with a deposit of the proceeds of that note; and on the same day, $2,000 was checked out to pay a note of Watt's of that amount, owed to the bank, probably for money advanced for the use of the Iowa Company, and more than what remained was applied on its debts. The overdraft increased, as said, until it reached over $6,000, when the $10,000 note was given, all in paying debts of the Iowa Company. The record leaves little, if any, doubt that all, or substantially all, of the proceeds of these notes were made use of in discharging the indebtedness of the Iowa Company, which, as seen, Watt agreed, at the meeting of the stockholders of the Iowa Company to pay; and this may account for his speaking in the first person, and for what he undertook to do, as evidenced by his con-

versation with the vice-president of the Bevington Bank, as testified by the latter's son, John Klemm, who was in the employment of the German Savings Bank:

"I was in the German Savings Bank when the name of my father was attached to the note, Exhibit 19. That was in the afternoon of May 21, 1909. At that time, I was working down at the plant of the Granite Brick Company, and Mr. O'Donnell and my father had been down there, and we had come in that afternoon in an automobile, and had come to the bank, and Mr. Watt called my father in to sign that note. I was present. It took place at Mr. Watt's desk, in the front end of the bank. I didn't take any part in the transaction or conversation, but I heard what was said. Mr. Watt called my father up to the desk and handed him the note, Exhibit 19, which was already filled out. Mr. O'Donnell was sitting in his chair opposite where I was standing, and Mr. Watt asked my father to sign the note. He says, 'I want to get this money at the Bevington Bank;' and papa said, 'If it is to become a loan for us to make down there, I object to making it.' Mr. Watt says, 'You know I have already made arrangements, and I have told you before that I would loan the Bevington Bank as much money as they would loan to the Granite Brick Company.' Papa says, 'I object to signing that down there.' Mr. Watt wanted to know if he would sign it if he endorsed, and my father said 'Yes,' and papa then signed it, and says, 'You will endorse that note,' and he says, 'Yes,' and he says, 'I will pay it when it comes due.'"

. This leaves no doubt that the loan was made on the credit of Watt, in so far as others than he and O'Donnell participated therein; and the record indicates not only that, but also that the proceeds were applied largely in discharging debts which Watt, in the resolution heretofore quoted, had undertaken to pay. Though there was no such concern as the Granite Pressed Brick Company, Watt must

have had this in mind as the name of the company to be organized. At any rate, the account was evidently opened through which to care for the obligations of the Iowa Company, precisely as the guarantees were obtained to cover its obligations, pending the organization of the Arizona Company and its assumption of the outstanding indebtedness of the Iowa Company. The fair inference from the record as recited is that he recognized his obligation to pay the note of May 21, 1909, and that it was executed on his express oral promise to endorse and pay; and he became quite as liable thereon as though he had endorsed it, as agreed. It was not a case of promising to pay the indebtedness of another, but an undertaking to accomplish a purpose of his own: i. e., obtain the $10,000 out of which to discharge, in whole or in part, the debts of the Iowa Company. The loan was not made on the credit of that company, but that of Watt, and what he did was to subserve a purpose of his own, and the promise was not within the statute of frauds. *Tarbell v. Stevens,* 7 Iowa 163; *Johnson v. Knapp,* 36 Iowa 616; *Blake v. Robinson,* 129 Iowa 196; *McDonald v. General Construction Co.,* 152 Iowa 273. The statute of frauds does not apply to promises in respect to debts created at the instance and for the benefit of the promisor, and plainly enough, the trial court did not err in holding that Watt was bound by his promises. What we have said is strongly confirmed by Watt's relation as partner in the Bevington Bank. In negotiating the loan for the Arizona Company. of which he was president, from this bank, of which he also was president, and obtaining from the German Savings Bank the money for it to loan to said company, the president of which he had been for many years, he knew that the company was without assets exceeding its obligations,—for it had merely taken over the Iowa Company's property, subject to its indebtedness, which the resolution of December 9, 1908, recited, exceeded what might be realized from its

assets; that the Bevington Bank was without funds to loan; and that the directors of the German Savings Bank were loath to allow more of its moneys to be turned into the brick manufacturing experiment. At the time of this resolution, the indebtedness of the Iowa Company was shown to have exceeded $40,000, the stock on hand to have been less than $10,000 in value, and its bills receivable little more than $2,000; and the value of the plant was estimated by one witness not to have been $10,000, and by another, to have had an actual value of $50,000, though he admitted that he subsequently stated that it was not worth more than $15,000 or $20,000. A dividend was never declared by either company, and each seems to have exacted the expenditure of an average of $2,000 or $3,000 per year, to continue the enterprise as a going concern. Watt was fully advised of the financial condition of the Arizona Company, and that it was without any property or assets above the indebtedness of the Iowa Company subject to which it had acquired title; and, in view of these and other circumstances alluded to, and especially of the fact that the loan was made to subserve his own purposes, the conclusion that what was done amounted to a misapplication of the partnership funds is not without foundation. Fair dealing between partners exacted the exclusion by him of all arrangements which were likely to impair the capital or profits of the firm. He might not sink the interests of the firm into those of himself alone, or of a corporation in which he was interested. Whatever he may have obtained out of the partnership in disregard of his obligation to the firm, equity will lay hold of and restore, as far as may be, to the partnership. Neither by open fraud nor concealed deception, nor by any contrivance masking his actual relations to the firm, can he be permitted to hold to his own use or in the use of a company in which he was

12. BANKS AND BANKING: officers: misapplication of funds.

interested, acquisitions made in disregard of his relation as partner.

"The relation of partners with each other is one of trust and confidence. Each is general agent of the firm and is bound to act in entire good faith to the other. The functions, rights and duties of partners in a great measure comprehend those both of trustee and agents; and the general rules of law applicable to such characters are applicable to them. Neither partner can, in the business and affairs of the firm, clandestinely stipulate for a private advantage to himself." *Mitchell v. Reed,* 61 N. Y. 123.

See *Kimberly v. Arms,* 129 U. S. 512 (32 L. Ed. 764); 30 Cyc. 446; *United States v. Heinze,* 218 U. S. 532 (21 Ann. Cas. 884), and note in which cases are collected.

A partner is not chargeable individually for losses attributable to mere errors of judgment, as distinguished from carelessness or bad faith. He is liable for such as result from any breach of his duty under the partnership articles, or which are not within the scope of the partnership business and which result from a willful disregard of duty on his part. *Exchange Bank of Leon v. Gardner,* 104 Iowa 176; *Charlton v. Sloan,* 76 Iowa 288; *Snell v. De Land,* 136 Ill. 533 (27 N. E. 183); 30 Cyc. 453; *Burson v. Stone & Co.,* 135 Ga. 115 (68 S. E. 1038); *Currier v. Bates,* 62 Iowa 527.

The misapplication or misappropriation by Watt does not necessarily mean that he is guilty of embezzlement. See *United States v. Heinze,* 218 U. S. 532 (21 Ann. Cas. 884); *Walsh v. United States,* 98 C. C. A. 461 (174 Fed. 615). As remarked in *Lear v. United States,* 77 C. C. A. 527, 537:

"A reckless act, moreover, is always regarded as the equivalent of a willful one. * * * The possibility of injury was apparent on the face of the transaction, notwithstanding which the interests of the institution of which he was the trusted head were put aside, and his own made paramount, in utter disregard of the outcome."

The circumstance that Watt undertook to endorse and pay the note plainly indicates that he had no intention of embezzling the partnership funds. On the other hand, it quite as plainly evidences a purpose on his part to so appropriate them as to render him personally liable therefor. What O'Donnell did in taking the note to the Bank of Bevington was merely in carrying out Watt's purpose, and can be given no other significance than that he had personal knowledge of what was being done, and interposed no objection thereto. Klemm also knew of the circumstances, and acquiesced in the transaction on condition that Watt should endorse and pay the note; but the mere assent of these parties to the appropriation of the funds of the bank by Watt would not relieve him from liability therefor.

Counsel for the executors suggest that the certificates of deposit issued by the Bevington Bank to the German Savings Bank had never been paid. This does not obviate the fact that these were valid and binding obligations of the Bevington Bank, and enforceable against that partnership, as well as the individual members thereof. Its business was so transacted as not only not to have yielded profits, but so that the original capital was entirely lost; and undoubtedly, the amount recovered from the estate of Watt will be absorbed in the liquidation of these certificates.

13. BANKS AND BANKING: officers: liability.

As the money of the German Savings Bank was made use of indirectly in making the loan, there is no want of equity involved in the restoration of its funds, unless it shall appear that the Arizona Company was one of its instrumentalities in acquiring property and conducting a business which the law prohibited. A thorough examination of the record has convinced us that such was not the case, and that both companies were independent corporations, and not mere agencies of the bank to carry on a business enterprise which it might not lawfully do, under the statutes of

this state. Prior to April 26, 1902, the only interest of the bank in the brick plant was that of creditor. It had loaned to Newman Bros., or Newman Brick Company, a copartnership, something over $7,000, payment of which was secured by a mortgage on the brick manufacturing plant. That the board of directors of the bank exacted a statement from the firm concerning its financial condition on January 6, 1900, and appointed a committee to examine its books, and even took over its plant, to protect its security, did not indicate that it had undertaken to carry on a business which it was not authorized to engage in. What the bank then did was not inconsistent with the carrying on of its own business of loaning money and guarding the security for its repayment. Subsequently, it acquired the plant under foreclosure of this mortgage; but, in the same year (1902), conveyed it to the Iowa Company, which had been organized by those previously interested in the plant, in consideration of the execution of a mortgage back on the property to secure the payment of the indebtedness. The latter company was organized May 24, 1902, with August and Carl Newman, Keefner, Watt, and B. M. Newman, as directors and officers, the first four being president, vice-president, secretary, and treasurer, in the order named. One fifth of the capital stock was issued to each of the above-named persons. Watt only was interested in the German Savings Bank. At that time, L. J. Wells, Charles Weitz, W. M. Wilcoxen, John R. Rollins, and W. G. Harrison were directors of the bank. At a meeting of the board of directors, held June 3, 1902, Wilcoxen moved that the president (Weitz) and the cashier (Watt) be authorized to execute a deed to the Granite Brick Company, and the motion was carried. The directors of the company adopted a resolution accepting the deed and bill of sale. Of the stockholders therein, Watt only was interested in the bank. Wilcoxen, who was then a director of

14. EVIDENCE: conclusions: understanding of witness.

the bank, and continued such until shortly before the hearing in the district court, and who, as attorney, attended to the foreclosure proceedings for the bank, and prepared the conveyances mentioned, testified, in substance, that the transfers mentioned were bona fide, and further, that he had never heard that the brick manufacturing plant belonged to the bank, or that it was operating such plant through these companies. L. H. Kurts served as director throughout the same period, but, according to his testimony, had never heard that the bank had any interest in or claim to the brick manufacturing plant, other than as creditor. August Newman, who was one of the organizers of the Iowa Company and its first president and a director throughout its existence, swore that he "didn't know that the German Savings Bank had any interest in the plant," and had never heard that the bank had any interest in it, or that the Iowa Company did not own it. Not a word is to be found in the minutes of the meetings of the board of directors of the Iowa or the Arizona Company or of the bank, inconsistent with full ownership on the part of these companies, and the bank's attitude is entirely consistent with the relation thereto of an over-indulgent creditor. On and after July 30, 1906, others of the officers of the bank than Watt acquired stock of directors of the bank, in the brick companies, nor is there any evidence of the bank's ownership of the brick plant other than the testimony of some witnesses in substance that they had so understood, and that Watt and O'Donnell had so declared. That the former is a mere conclusion and not admissible as evidence is manifest. Even if received without objection, such testimony is not at all persuasive. As to evidence of declarations by Watt and O'Donnell, we are of opinion that it may not be considered. Both had departed this life, and their interests in this respect were distinctly hostile to

15. EVIDENCE: declaration of one having conflicting interests.

those of the bank. This being so, in whatever they may
have said, they cannot be regarded as representing the
bank. *Love v. Anchor Raisin Vineyard Co.,* (Cal.) 45 Pac.
1044; *State Sav. Bank v. Montgomery,* 126 Mich. 327 (85
N. W. 879); *Wheeler v. Home Sav. & St. Bank,* 188 Ill. 34
(58 N. E. 598); 2 Thompson on Corporations (2d Ed.) 1262.
Even the officers of a bank cannot be permitted to serve two
masters having conflicting interests at the same time, them-
selves and the bank; and when speaking in their own inter-
ests, when antagonistic to those of the bank, what they
may say cannot be treated as declarations binding their
principal, the bank. This is for the reason, among others,
that such declarations cannot be said to have been
made in the course of their employment by, or in the
performance of their official duties in behalf of, the bank.
Those interested in the bank who became stockholders in
the companies operating the brick plant may well have had
in mind the protection of the bank's claims against them,
and probably this was Watt's motive in participating in
the organization of the Iowa Company, and possibly the
Arizona Company also; but whatever the purpose, the evi-
dence does not warrant the conclusion that the officers and
directors of this bank persistently, for a period of over
10 years, violated the banking laws of this state by operat-
ing a manufacturing plant clandestinely, through the in-
strumentalities of apparently independent corporations.

V. On May 21, 1912, the Des Moines National Bank filed
its claim against the estate of Watt, based on a promissory
note of $10,000, dated December 14, 1910, payable on de-
mand to said bank, and executed by the
Granite Brick Company, and endorsed by
Watt, O'Donnell, Klemm, and Wells. Ac-
tion was brought against the last three on
December 26, 1913. The defense of the ex-
ecutors of the estate of Watt is that the indebtedness was

16. BILLS AND
NOTES : exe-
cution and de-
livery : fail-
ure to read :
effect.

that of the German Savings Bank, and it had consolidated
with the Des Moines National Bank, the latter taking over
all its assets, and, as these exceeded its liabilities, there
cannot be any recovery.

Klemm and Wells each interposed the defense that the
German Savings Bank really borrowed the money to reduce
the indebtedness of the Granite Brick Company to it, and,
to induce them to endorse the note, promised to keep them
harmless, and further as alleged by the executors. The
note was in renewal of one for like amount, and signed by
the same parties, October 26, 1909. The defense based
on the alleged ownership and operation of the brick plant
by the German Savings Bank has been disposed of, but
Wells and Klemm insist that the loan was procured for the
benefit of said bank, and that they endorsed the note for
that purpose, and that, if they are held liable thereon,
judgment should be entered over against the German Sav-
ings Bank. It appears, however, that a check for the
amount of the loan ran from the Des Moines National Bank
to the Arizona Company, and it was turned over to the Ger-
man Savings Bank by the Arizona Company, and by it en-
tered to the credit of said company, and applied on its in-
debtedness. Wells testified that, at the time the first note
was given, Watt said to him at the bank, in substance, that
their cash was running short, and he would like to have him
and some others endorse a note; and that, when Watt pro-
duced the note, he added his name to those of the other
three; that, in signing, he supposed Watt was the princi-
pal; and that Watt remarked that the bank would take care
of the note. That he thought Watt the maker is not per-
suasive; for Watt was one of the endorsers whose names
he observed, and he does not claim that anything was said
to deceive him, and nothing prevented him from reading
the note, if he were so disposed. He is not in a situation
to assert lack of knowledge as to its contents. *Bonnot Co*

*v. Newman Bros.*, 108 Iowa 158; *Mower H. C. & D. S. Co. v. Hill,* 135 Iowa 600. Klemm understood that the maker of the note was the Arizona Company, but in other respects the talk to him was the same as to Wells. Neither was told that the borrowed money would go directly to the bank, and, in view of the maker's being the Arizona Company, they might well have inferred that funds were to be obtained by the bank through payment by that company to it. Such payment was for the benefit of the borrower, and the bank thereby obtained

17. BANKS AND BANKING: directors: scope of authority.

no more than was its due. According to the evidence, Watt said to each of them that the German Savings Bank would take care of the note. Counsel for Wells concedes that the bank would not be bound by the promise, for that such a promise by the bank would be *ultra vires.* Section 1855-a, Code Supplement, 1913, provides that:

"State and savings banks may contract indebtedness or liability for the following purposes only: for necessary expenses in managing and transacting their business, for deposits, and to pay depositors; provided, that in pursuance to an order of the board of directors previously adopted, other liabilities not in excess of amount equal to the capital stock may be incurred."

Wells and Klemm were quite as well aware as Watt that no such order had been entered by the board of directors, and that the bank might not obligate itself for the indebtedness of another, for they were directors of the bank. They were also directors of the Arizona Company, and will be assumed to have known the law, and therefore that, through the machinations of themselves, O'Donnell, and Watt, directors of the Brick Company, they might not lawfully saddle indebtedness of that company onto the bank, of which they were directors. Moreover, if Watt did, in the interest of the Arizona Company, undertake to obligate

the German Savings Bank to pay that company's debt, the bank was not bound thereby; for in so doing, he was interested adversely to the bank, and might not speak for it in a transaction wherein he was acting for himself also, and for another whom he represented, adversely interested. See *State Sav. Bank v. Montgomery,* supra; *Love v. Anchor Raisin Vineyard Co.,* (Cal.) 45 Pac. 1044.

But it is argued that, even though the undertaking be regarded as *ultra vires,* the bank will be liable for the money received. There are two sufficient answers to this: one, that the money was received from the Arizona Company, rather than the Des Moines National Bank; and the other is that to permit such relief in the interest of some of the directors of the bank would defeat the very object of the statute quoted. To prohibit incurring a debt without an order of the board of directors, and then to allow recovery of money so obtained by or in the interest of the director violating the prohibitory statute, would not only render the statute nugatory, but put a premium on want of fidelity in the relation of director to the bank. Our conclusion throughout is in accord with the findings and decree of the district court.

Cost of printing briefs will be taxed against party filing same, and one third of cost of printing abstracts taxed against executors of the Watt estate, one third thereof and the filing fee against the German Savings Bank and Des Moines National Bank, and the remaining third against the other appellants.—*Affirmed.*

GAYNOR, C. J., EVANS and SALINGER, JJ., concur.