L. A. ANDREW, State Superintendent of Banking, Appellant, v. FIRST NATIONAL BANK OF SIOUX CITY, Appellee.

**BILLS AND NOTES: Liability of Parties—Beneficiary of Loan.** A promissory note executed by the maker in order to raise funds with which to take up his personal indebtedness to a bank is not in any sense the obligation of said bank (1) because the president of said bank personally indorsed the note, or (2) because the payee (who was correspondent for said bank), on accepting the note, credited said bank with the amount, or (3) because said bank applied the credit on the maker's indebtedness to said bank.

Headnote 1: 8 C. J. p. 1053.

*Appeal from Woodbury District Court.*—C. C. HAMILTON, Judge.

FEBRUARY 15, 1927.

Replevin for promissory notes deposited by the Battle Creek Savings Bank, of which plaintiff is receiver, with the defendant,

First National Bank of Sioux City, Iowa, as collateral. Judgment for defendant. Plaintiff appeals.—*Reversed.*

*Campbell & Campbell* and *Snyder, Gleysteen, Purdy & Harper,* for appellant.

*Shull, Stilwill, Shull & Wadden,* for appellee.

MORLING, J.—The ultimate question is whether the promissory note for $25,000, dated December 10, 1923, signed by James Warnock, indorsed by D. H. Hedrick, and payable to the order of the defendant, First National Bank of Sioux City, is, as it purports to be, only the liability of the maker and indorser, or whether it is the liability of the Battle Creek Savings Bank. The defendant has a collateral security agreement with the Battle Creek Savings Bank, by which all collateral received from the Battle Creek Savings Bank is pledged for the payment of all of the indebtedness of the Battle Creek Savings Bank to the defendant. The promissory notes sought to be replevined in this action were received by the defendant from the Battle Creek Savings Bank as collateral security. The direct obligations of the Battle Creek Savings Bank to defendant have been paid. It is the claim of the defendant that the $25,000 note is an indirect liability of the Battle Creek Savings Bank, for the payment of which the defendant, under the collateral security agreement, may hold the notes sued for.

The $25,000 represented by the note mentioned was originally borrowed June 15, 1922, on a similar note, which has, from time to time, been renewed. The defendant made the loan through J. J. Large, its former president. An extension was also made by Mr. Large. Mr. Large was not a witness. Mr. Mitchell, the vice president, was a witness, but he does not profess to have any personal knowledge of the original transaction or renewals.

The maker, Warnock, was a director of the Battle Creek Savings Bank. Hedrick was its president. Warnock and his associates, who were also directors of the Battle Creek Savings Bank, and who had an organization of their own, called the Battle Creek Loan Company, were heavily indebted to the Battle Creek Savings Bank. The loans of the Battle Creek Savings

Bank to Warnock were "over-loans." The banking department objected to them. Hedrick wanted to get Warnock's paper out of the bank. Hedrick arranged with Large for a loan of $25,000 on a note signed by Warnock and indorsed by Hedrick. Hedrick says:

"I indorsed it because I was assured I would have collateral, and wanted to get Mr. Warnock's paper out of the bank, and because of the fact I was president of the Battle Creek Savings Bank, and had the welfare of the bank at heart; and I, except in my official capacity, had absolutely no interest in the proceeds of that loan, so what I done was done in the interest and on behalf of the Battle Creek Savings Bank."

It is on this statement, and on the fact that the proceeds of the loan were credited by defendant to the Battle Creek Savings Bank, with which it had an account, and that part of the proceeds were used to take up the balance of a $20,000 note signed by the directors of the Battle Creek Savings Bank, that defendant founds its claim; and the lower court evidently held that in some way the $25,000 note was a liability of the Battle Creek Savings Bank. Hedrick testified further:

"Q. Now, the purpose for which the loan of $25,000 was made, was to take up the over-loan that Mr. Warnock had in the Battle Creek Savings Bank, wasn't it? * * * A. That was the intention of it. * * * It was Mr. Warnock's primary liability and my secondary liability. Q. And you had taken security to secure your indorsement of the note to the bank? A. Yes, sir."

Hedrick did take security from Warnock, and assigned it to the defendant, and the defendant foreclosed upon it. The testimony of Warnock is to the same effect.

The defendant was a correspondent of the Battle Creek Savings Bank. When it made the $25,000 loan, it credited the proceeds to the Battle Creek Savings Bank. A part of this credit seems to have been used to take up the balance of a note given by the Battle Creek Loan Company, held by defendant. The Battle Creek Loan Company was composed of the directors of the Battle Creek Savings Bank. The evidence is that the money represented by that note was borrowed for the Battle Creek Loan Company; but, while Hedrick testified that the Loan Company was conducted as a sort of an adjunct of the bank, and for the purpose of furthering its interests, there is no evidence from

which it can be found that the debts of the Battle Creek Loan
Company were the debts of the Battle Creek Savings Bank.

As has been said, the $25,000 was credited by defendant to
the Battle Creek Savings Bank. The Battle Creek Savings Bank
credited the $25,000 to Warnock, and charged Warnock with
Warnock's notes. The deduction of Warnock's notes from the
$25,000 left for this item a net credit of $1,744.62 to Warnock's
account with the bank. Whether the account was overdrawn or
not is not shown.

On November 13, 1923, Hedrick wrote to Mitchell, vice presi-
dent, that the "$25,000 of James Warnock on which I am indors-
er, and for which I hold collateral, was never considered as a
bank loan, but was made and arranged individually with Mr.
Large." It was after this letter was written that the collateral
agreement was made.

On November 10, 1923, the Battle Creek Savings Bank gave
to defendant its promissory note for $10,000, payable December
10, 1923. This note was signed by the Battle Creek Savings
Bank, and was secured by a number of promissory notes pledged
by the Battle Creek Savings Bank to the defendant bank as se-
curity, and noted on the $10,000 note. Under date of December
11, 1923, the collateral security agreement in question was exe-
cuted by the Battle Creek Savings Bank. This agreement, after
reciting that the Battle Creek Savings Bank expected to borrow
money from the defendant bank from time to time, and to pledge
with defendant various kinds of property as collateral "for the
payment of such loan or loans, to be hereafter made by said
bank," proceeds:

"Now therefore the undersigned agree with said bank that
all of the property thus pledged with it may be held as collateral
security for the payment of any and all such loan or loans, as
well as for the payment of all financial accommodations given or
to be given to the undersigned by said bank, and for the payment
of any and all debts now existing, or hereafter to be created, in
any manner whatsoever due from the undersigned to said bank,
and also for the payment of any and all other present and future
obligations, indebtedness, and liabilities of every kind and na-
ture, direct or indirect, or contingent, and whether due or to be-
come due, or that may hereafter be contracted; and the under-
signed further agree to deliver to said bank additional securities,

or to make payments on account to its satisfaction, should the market value of said securities suffer any decline. * * *''

On December 15, 1923, Miller became vice president of the Battle Creek Savings Bank. On December 17, 1923, Miller wrote to defendant asking for a statement of the borrowings of the Battle Creek Savings Bank, together with a list of notes held as rediscounts or collateral. On December 19, 1923, Mr. Mitchell replied, ''We give you below list of notes we hold as collateral to your bills payable of November 10 (maturing December 10) $10,000,''—followed with a list of the collateral.

It will be noted that defendant did not then claim to hold the $25,000 note as an obligation of the Battle Creek Savings Bank.

There is no evidence that the $25,000 was borrowed for the benefit of the Battle Creek Savings Bank, in any other sense than that the proceeds were to be used in getting Warnock's paper out of the bank. No claim that the $25,000 note was the debt of the Battle Creek Bank was made until after the receivership. Defendant had notice, and assumed the contrary. Without further detailing the evidence, which is extensive, we may say that, on the record before us, a finding of fact and law that the Battle Creek Savings Bank was indebted to the defendant on the $25,000 note would be wholly without support.

This result makes it unnecessary to discuss appellant's further proposition that the $25,000 note, as a direct obligation of Warnock and Hedrick to defendant, is not one for which the Battle Creek Savings Bank could legally render itself liable: but see *State ex rel. Carroll v. Corning St. Sav. Bank*, 136 Iowa 79; *Thilmany v. Iowa Paper Bag Co.*, 108 Iowa 333; *State ex rel. Carroll v. Corning Sav. Bank*, 139 Iowa 338; *Watt v. German Sav. Bank*, 183 Iowa 346.

The judgment is—*Reversed.*

EVANS, C. J., and DE GRAFF and ALBERT, JJ., concur.