Roy LINDBURG et al., Plaintiffs, Appellants, v. J. A. ENGSTER et al., Defendants, Appellees; W. R. PAYNE, Receiver (Oscar Helgerson, substitute Receiver) and COMMERCIAL NATIONAL BANK of Essex, Interveners, Appellees.

No. 42975.

December 17, 1935.

Ferguson & Ferguson, and Stipe, Davidson & Davidson, for appellants.

L. H. Mattox, for appellees.

Keenan, Barnes & Clovis and C. R. Barnes, for interveners.

HAMILTON, J.—The note and mortgage upon which this suit is based were executed and delivered to the plaintiffs by the defendants, J. A. Engster and Anna Engster, on October 16, 1929, and duly recorded the following day. The principal amount of the note was $7,000. The mortgage covered a fractional quarter section of real estate in Page county, containing 146 acres, and was subject to a prior mortgage thereon of $14,500 held by the Federal Land Bank of Omaha. Failure to pay the interest installment due April 1, 1931, rendered the whole debt due and payable, by virtue of an acceleration clause contained in said mortgage, and this suit was commenced against the makers of said note and mortgage by filing a petition May 23, 1931, in the district court of Page county, Iowa, which petition is in the usual form. The Commercial National Bank of Eessex, Iowa, held a chattel mortgage on the crops to be grown on this real estate prior in point of time to the commencement of this action. This bank, through its receiver, intervened, claiming the rents and profits for 1931 under said chattel mortgage. There was a decree for plaintiffs on the $7,000 note for the amount due

and foreclosure of the mortgage, the court reserving the question of receivership, rents, and profits to be determined later. There was a sheriff's sale under special execution, and plaintiffs purchased said property at execution sale for the sum of $1,000.

In the original petition, no claim was made against the bank or any one else, except the makers of said note and mortgage, and the original note and mortgage were surrendered, attached to the decree, and canceled. Thereafter, by way of amendment and cross-petition as against the intervener bank, plaintiffs set up an alleged oral agreement or contract between the Commercial National Bank of Essex and the plaintiffs, based, in substance and effect, upon the following facts: At the time this loan was made, Engster, who was a director of the bank, owed the bank some $10,000 which was above the statutory limit which could be loaned to one person, and the bank examiner had demanded that this Engster line of indebtedness be reduced. It appears that because of bad debts the surplus of the bank had been reduced to $25,000 which no longer permitted them to carry a debt of $10,000 against Mr. Engster. The reduction of this indebtedness was first attempted by means of two of the directors loaning Engster the money to reduce his indebtedness to $7,000. These two directors took his notes for $1,500 each, secured by chattel mortgage. This was not satisfactory to the examiner, and further demand was made, and it is claimed that the board of directors of the bank sent George Lindburg, father of the plaintiff Roy Lindburg, the father also being a director of said bank and a member of the finance committee, to interview his son with reference to borrowing $7,000 to take up the Engster line of indebtedness. The father, George Lindburg, testifies that the son agreed to loan the money to the bank, but refused to loan it to Engster. The son also testifies to this, but the father finally admits that the son agreed to loan the money to Engster and take a second mortgage on the Engster farm, but that he would look to the bank for payment, and that the bank, through its board of directors, agreed that if he would let Engster have the money it would guarantee the repayment thereof.

The plaintiffs had $3,500 on deposit in the Commercial Bank and also $3,500 in another bank in Essex, which was drawn out, and the entire $7,000 placed in Roy Lindburg's checking account in the Commercial National Bank. It is undisputed that Roy Lindburg issued a check to Engster for $7,000. This

check was indorsed by Engster and deposited to Engster's account in the bank. Engster then issued checks on this account, paying the two $1,500 notes which he owed the two directors, and the balance was paid to the bank, which left him owing the bank the sum of $3,000, for which he gave a new note to the bank. This new note was secured by a chattel mortgage on the crops and on some livestock and farm machinery. The mortgage to the Lindburgs was filed for record by Mr. Freed, cashier of the bank, and after being recorded, the note and mortgage were placed in an envelope marked on the outside "Property of Roy Lindberg" and at the request of the father, George Lindburg, placed in his safety deposit box, the son, Roy, having no safety deposit box in the bank. It appears from the record that the interest on this note was collected from Engster through the bank by Mr. Freed; that one payment of interest was made by George Lindburg and later paid back to him by the bank. These interest payments were all credited to the account of Roy Lindburg in the bank. Roy Lindburg paid one interest payment on the Federal Land Bank first mortgage to prevent foreclosure of said mortgage. This alleged contract with the bank to guarantee the payment of this indebtedness was based on testimony of the father and son, corroborated to some extent by the cashier. That the negotiations were all made through George Lindburg and the cashier, acting as go-between for Roy Lindburg and the Engsters, and that there were no direct negotiations between the plaintiff, and Engster at the time or prior to the consummation of the loan, is undisputed.

Interveners, by way of answer to the petition as amended, deny the contract of guaranty, plead the same was illegal, ultra vires, and void, plead that the plaintiffs had elected their remedy and were barred and estopped from claiming under said alleged oral contract, or under an implied contract as for money had and received; that the alleged transaction on the face of it was a fraud upon the public and the depositors, and could not form the basis of a cause of action, and was not binding upon the receiver of the bank.

After reading the entire record in this case, we are impressed with the thought that this is another of the numerous lawsuits growing out of the aftermath of bank failures which have confronted the courts in the last few years, wherein the parties, in order to save or attempt to save their life accumu-

lations and savings have been forced to take inconsistent positions, and twist, warp, and contort the actual transaction into something entirely different than was ever intended in the first instance, and which will not bear close scrutiny. This 146 acres of land is located on a second bottom, not subject to overflow, and is thoroughly drained by an open ditch and underground tile, very highly improved with modern improvements. It must be noticed that this loan was made before the financial crash reached bottom. The cashier of this bank, upon whose evidence plaintiff relies, testified that in his judgment Engster had an equity above the first mortgage of approximately $11,000; that the farm was equipped with splendid buildings and located only three miles from the farm of Roy Lindburg's father. The estimated value of the personal assets of Engster was in the neighborhood of $8,000. At the time this mortgage was executed he had about 500 head of hogs. At that time the price of hogs, according to the evidence, was $9.90 at Omaha, corn was worth 75 cents to 95 cents per bushel, cattle were worth 14 cents. There was evidence of the sale of other farms of like character in that vicinity, no better than this Engster.farm, one for $177 per acre, another for $190. Another farm of the same acreage sold for $26,000 spot cash. All these farms were within a few miles of the Engster farm. One witness testified to having had a conversation with the plaintiff Roy Lindburg with reference to this second mortgage, and that Roy told him that if he took this farm under his mortgage it would stand him about $140 per acre. The witness said that Roy told him there was a long-term loan on the farm, and all he would have to do would be to take it over. The witness said, "That don't seem very high for that place," and Roy said, "No, not the way land has been selling." Roy admitted having this conversation, but denied making these statements. Three of the directors, who, it is claimed by George Lindburg, were present at the board meeting wherein it was agreed that the bank would guarantee the repayment of this loan and stand behind the same if Roy would loan the money to Engster, deny that any such agreement was entered into.

The cashier, Victor Freed, first blows hot and then cold. Not much credence can be given to testimony of this character. At one place in his testimony he says: "The sum and substance of what was meant (referring to the talk at the board meeting) was that the bank which had the chattel mortgage on all the

personal property, livestock and crops owned by Engster would permit Engster to sell some of the mortgaged property and use the proceeds to pay Roy Lindburg's interest so as to avoid the necessity of foreclosing the Roy Lindburg loan. I want my testimony understood to mean that the bank paid this interest on the $7,000.00 mortgage from time to time by releasing sufficient of the chattel mortgage property to get the money with which to pay it. There was no thought that the bank would pay it out of general assets, because Engster always had a large number of hogs, about 500 head, and he always made his interest.'' There was some evidence from the other directors to the same effect, that the bank would be required to release some of their mortgaged property to enable Engster to pay the interest on this Lindburg note. Engster also testified that he had a large number of hogs. Of course, he could not pay anything on the Lindburg interest unless the bank would release some of the mortgaged hogs or other mortgaged property which Engster had for sale.

We have carefully gone all through this record. It has been no small task in view of the fact that large portions of material testimony were omitted from the appellants' abstract, and in order to arrive at the facts we have had to compare and read the matter contained in appellees' amendment to abstract in conjunction with the matter set out in the original abstract. In the preparation of abstracts, briefs, and arguments, counsel for appellants have not carefully followed the rules of this court. We have overlooked this matter in this case, but unless counsel are more careful to follow the plain rules of this court, it will be necessary to enforce penalty against offenders.

 We are constrained to hold, from the evidence and all the facts and circumstances surrounding this case, taking into account the sworn statements contained in the original petition, wherein there is no intimation or claim against the bank, the further fact that the foreclosure suit was instituted by the plaintiffs without in any way consulting the bank officials, and that no claim was ever filed by the plaintiffs against the receiver of this bank, the relationship existing between the father and son and their personal interest in the result of the trial, the contradictory and inconsistent statements of the cashier, the fact that the wife of Roy Lindburg, who is one of the plaintiffs, was not called as a witness, the positive denial of the alleged contract on the part of

three of the directors of the bank, and other facts and circumstances, that the evidence fails to establish the alleged oral agreement.

What was said between the father and son, is, of course, undenied, there being no one present who could deny the same, except the plaintiff Hannah Lindburg, and she did not see fit to take the witness stand in her own behalf or in behalf of her husband, the only excuse given being that one of the children was sick and she was required to remain at home to care for the child. No effort was made to obtain a continuance on account of this situation. However, the talk between the father and son, or any agreement made by them, even though the father was a director of the bank, unless authorized by the board of directors or ratified by such board, would not be binding upon the bank. That there was talk by the cashier that the bank would look after the collecting of the interest for the plaintiffs and other loose and random talk by the cashier that the bank would stand behind the loan, may be true. The freedom with which Mr. Freed, the cashier, jumps from one side of this case to the other in his testimony would indicate that he might make many loose and random statements or promises, but that there was anything done which amounted to official action by the board of directors of the bank sufficient to establish an oral agreement to guarantee the payment of this note, or that the loan was a loan to the bank and not to Engster, as contended for by appellants, is not shown by the evidence to the satisfaction of the court. That George Lindburg, a banker of long years' experience would permit his son and daughter-in-law to part with $7,000 on a shoestring oral agreement on the part of the bank to guarantee the loan as the only assurance that the son would ever receive repayment is almost unbelievable. George Lindburg and the cashier excuse this lack of business efficiency by saying they did not want the contract to appear on the minutes of the bank. This is a veiled admission that they were conspiring together to deceive the banking department, but even though they were attempting to deceive the banking department by not making the matter of record, this would not prevent putting the contract in writing between the son and the cashier as the official representative of the bank, to protect the son. That the bank received a benefit from this loan is not denied. The examiner was demanding the reduction of the Engster line of

credit. One director testified that the first suggestion came from George Lindburg himself that his son might take up the Engster note. George Lindburg says that the suggestion came from the cashier. The fact remains that the son had $7,000 on deposit in these two banks. This particular bank was in distress. The evidence shows that there had been other bank failures. The great weight and preponderance of the evidence is to the effect that the equity in this Engster farm was more than $7,000, and it was located near the farm of George Lindburg. To charge this Engster line off of the bank records would reduce the surplus to a low ebb. The evidence shows that there was fear on the part of the directors of arousing public suspicion, so much so that some of the meetings of the board of directors were held out at the George Lindburg farm home. It is not an unreasonable inference or deduction from this situation that George Lindburg, as he thought this situation over, considered at that time, the mortgage investment for his son equally as safe and secure as the deposits in the banks, even though it was a second mortgage.

██ However, the holding of the court is not confined to this question of the weight of evidence alone. Aside from this or the claim of ultra vires, there is the further and more serious question of the competency of any of this testimony in relation to the alleged oral contract of guaranty. This alleged contract in its entirety rests in parol. It was an agreement to answer for the debt, default, or miscarriage of another, and therefore came within the provisions of the statute of frauds, and no evidence of such contract is competent unless it be in writing and signed by the party charged or by his authorized agent.

██ It is the contention of the appellants that there was no objection to the introduction of this line of testimony on the ground that the contract came within the statute of frauds (Code 1935, section 11285). Apparently appellants' counsel have overlooked the agreement and stipulation made a matter of record before any evidence was introduced, containing the following: "It is hereby stipulated and agreed by and between the parties herein and with the consent of the court that the making of objections by either party at the time of examination of any witness in this case is hereby waived and it shall be considered that any objections known to the law shall be considered as having been made as if made at the time of the examination of the wit-

nesses." This stipulation was dictated into the record by the trial court, and the appellants must be held to be bound thereby Therefore, we must hold that there was no competent proof of the existence of said alleged oral contract of guaranty.

■■■ It is likewise urged by appellants that this issue was not before the court and was only put in issue by belated amendment to the answer of interveners, which was not filed until after the case was fully tried and submitted to the court, and to which the appellants filed a motion to strike, which motion was overruled by the court in its final decree, and the ruling of the court in this regard is assigned as error. In the first place, the pleading was unnecessary. The petition on its face disclosed that the contract relied upon came within the statute of frauds. In order to recover, the burden was on the appellants to establish such contract by competent proof. The answer contained a denial of the existence of such contract. All evidence introduced was objected to for every reason known to the law, by virtue of the stipulation of counsel. The amendment presented no new issue. The issue was made by objection to the testimony, and that was sufficient. Gilman v. McDaniels, 177 Iowa 76, 158 N. W. 459; Thompson v. Frakes, 112 Iowa 585, 84 N. W. 703.

■■■ Appellants also plead an implied contract and estoppel. If there is no competent proof of the existence of the oral contract, then there is no basis for either of these claims. This court said in Smith v. Tramel, 68 Iowa 488, 27 N. W. 471, 472:

"An oral promise to pay the debt of another cannot constitute an estoppel. If it could, all the mischief would be let in at once which the statute of frauds was designed to prevent."

And in the case of Regan v. Kirk, 140 Iowa 302, 118 N. W. 317, 318, which was an action on a contract within the statute of frauds, wherein the lower court attempted to submit to the jury the question of an implied contract this court said:

"This was clearly erroneous. The fact that the promisee relies on an unenforceable promise does not validate it. The contract itself must be such as is enforceable upon performance. Evidence of an oral agreement to 'answer the debt, default or miscarriage of another' is inadmissible under the statute, regardless of whether it is acted on or not."

■■■ It is also argued by appellant that the bank is liable on the theory that it was the recipient of the money and that this oral agreement was the inducing cause of the plaintiffs parting with their money and having received the benefit of the loan, that the consideration passed directly from the bank to plaintiffs, and that there is an implied contract between the plaintiffs and the bank that the bank will either return the money or compensate the plaintiffs therefor. They base their contention on the authority of the Citizens' Central National Bank v. Appleton, 216 U. S. 196, 30 S. Ct. 364, 366, 54 L. Ed. 443. The principle is clearly stated by Justice Gray in the following language:

" 'A contract ultra vires being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it. In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms, but on an implied contract of the defendant to return, or, failing to do that, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm, the unlawful contract.' * * * The right to a recovery of the property transferred under an illegal contract is founded upon the implied promise to return or to make compensation for it.''

And in connection with this principle appellants cite and rely upon our own cases, Watt v. German Savings Bank, 183 Iowa 346, 165 N. W. 897; Kladivo v. Melberg, 210 Iowa 306, 227 N. W. 833, 838, wherein this rule is laid down:

"Whenever the main purpose and object of the promisor is not to answer for another, but to subserve some pecuniary or business purpose of his own, involving either a benefit to himself or damage to the other contracting party, his promise is not within the statute, although it may be in form a promise to pay the debt of another. * * * 'The statute contemplates the mere promise of one man to be responsible for another, and cannot

be interposed as a cover and shield against the *actual obligations of·the defendant himself.'* " (Italics ours.)

That this principle of law is well established in this state and many other jurisdictions cannot be questioned when applied to a proper case. In this case, however, we have already found against the appellants on the facts, and even though the facts were such as to sustain appellants' contention in this respect, the legal principle of election of remedies which was interposed as a defense in this case would bar the appellant from recovery as against the bank. By the original petition filed in this case, plaintiffs planted their suit squarely against Engster, based upon an express contract between the plaintiffs and Engsters, recovery upon which depended upon the validity of said contract, in which it is alleged that the money was loaned to Engster and for which Engster gave his note and mortgage. This was pursued to judgment, and the note and mortgage were merged in the judgment and surrendered and canceled. Having elected to treat Engster as the debtor, appellants cannot change their position and seek to hold the bank on an implied contract as for money had and received for the same identical money which was loaned to Engster. The one is inconsistent with the other. "Where a party has grounds to bring separate actions against different persons and a maintenance of one necessitates an allegation of a fact or the assumption of a position inconsistent with or repugnant to the maintenance of another, he is bound by his election and cannot proceed against the other. In other words, where a party has suffered actionable wrong, he will not be permitted to pursue inconsistent remedies against different persons." 20 C. J. 17.

The rule adopted in this state, as stated in Kearney Milling & Elevator Co. v. Union Pac. R. Co., 97 Iowa 719, 66 N. W. 1059, 1061, 59 Am. St. Rep. 434, and which rule has been adhered to ever since, is stated in the following language:

"A man may not take two contradictory positions, and where he has a right to choose one of two modes of redress, and the two are so inconsistent that the assertion of one involves the negation or repudiation of the other, his deliberate and settled choice of one, with knowledge, or means of knowledge, of such facts as would authorize a resort to each, will preclude him

thereafter from going back and electing again.'' See, also, Sackett v. Farmers State Bank, 209 Iowa 487, 228 N. W. 51.

Appellants in their argument fail to distinguish between the contract of guaranty and the alleged implied contract by which they seek to hold the bank. Appellants argue the case as though this was a joint obligation between the Engsters and the bank. The only theory by which it could be a joint obligation would be on the theory that the bank was a guarantor of the same debt upon which Engsters were liable as principals or makers. We have already found that there was no such contract established by competent proof. The implied obligation to repay the money which it is alleged the bank received, and which they alleged the plaintiff would not have parted with but for the agreement, is an entirely separate contract from the contract evidenced by the note or by the alleged contract of guaranty. Under the alleged contract of guaranty, the bank, if liable at all, would be liable for the whole amount of the note, whereas under the implied contract which the law creates or raises up, where the bank receives the money, the bank is only liable for the amount received on the theory that having received the money or property, even though the contract under which it received it was void, there was a legal duty to return what it received or compensate therefor. This claim amounts to an independent action against the bank, in which the Engsters, the original makers of the note, have no concern. The plaintiff could not pursue Engsters on the express contract with full knowledge of the facts upon which they now base their alleged implied contract for money had and received as against the bank, and failing to receive full relief from the Engsters, now elect again to sue the bank on an entirely different contract. The right to recover against the one under such circumstances is inconsistent with the right to recover against the other, and therefore comes within the doctrine of election of remedies heretofore set out.

There are other matters argued by the parties which it is unnecessary for us to consider. What we have said disposes of the case. It is another of the many unfortunate situations due to the wiping out of values by this thing called ''the depression'', which has brought untold suffering and misery and has caused much litigation, presenting many complicated problems

for solution by the courts. We have carefully considered this entire record, and finding no error, the case must be, and it is, affirmed.—Affirmed.

KINTZINGER, C. J., and PARSONS, ANDERSON, DONEGAN, MITCHELL, POWERS, and ALBERT, JJ., concur.