THE EXCHANGE BANK OF LEON, *et al.*, Appellants, v. C. E. GARDNER, *et al.*

**Banking Partnership:** DUTY OF CASHIER. It is the duty of a partner in a banking business, to whom is left the active management of the business, to act in good faith, and with entire honesty, in transacting all the business of the bank, and to exercise as high a degree of care and skill as is generally exercised by business men, in the management of such business; but he is not liable for honest errors in judgment, nor for the failure to take the utmost precaution possible, in making investments for the bank.

RULE APPLIED to a case where an attempt was made to incorporate a bank under Iowa law which was never so incorporated, though it was, for a time, managed according to the articles of incorporation. The bank had a large amount of idle money on which it was paying interest and one partner acting as cashier, bought Kansas City paper which proved almost wholly worthless, While some inquiries were made, more thorough ones would have disclosed the truth. The president knew or should have known that outside investments were being made, and no objection was made to the practice.

KINNE, C. J., taking no part.

*Appeal from Decatur District Court.*—HON. H. M. TOWNER, Judge.

SATURDAY, DECEMBER 18, 1897.

ACTION in equity for an accounting, and to recover of the defendant C. E. Gardner, fifteen thousand dollars on account of poor investments made by him as cashier of the plaintiff bank. There was a hearing on the merits, and a judgment in favor of the defendants for costs. The plaintiffs appeal.—*Affirmed.*

*Harvey & Parrish* for appellants.

*Hoffman & Baker* and *T. M. Stuart* for appellees.

ROBINSON, J.—The plaintiff the Exchange Bank of Leon is a co-partnership, which was organized in the year 1888, with a capital of thirty thousand dollars, and is engaged in business at Leon. The partners who composed the firm were the plaintiffs S. W. Hurst, I. N. Clark, H. J. Vogt, Orr Sang, C. S. Stearns, and the defendants C. E. Gardner and R. D. Gardner. The person last named is the father of his co-defendant, and is made a defendant because he would not join as plaintiff. No relief is asked as against him. Therefore, when we refer to "Gardner," C. E. Gardner is the person intended. Gardner was cashier of the bank from the time it was organized until the summer of 1894, when he was discharged. In October, 1890, he purchased of a Kansas City corporation, known as the Winner Investment Company, two promissory notes, one of which was for two thousand dollars, and the other for four thousand dollars. They purported to be signed by one J. R. Anderson, and were indorsed by the Winner Investment Company, and by W. E. Winner, and were secured by bonds of the Winner Building Company, a Kansas City corporation, to the amount of six thousand dollars. The larger of the two notes was renewed in the form of two notes, each of which was for the sum of two thousand dollars. In the latter part of November of the same year, Gardner purchased two promissory notes, made by Martin O. Ellis, of Kansas City, one of which was for the sum of two thousand, five hundred and seventy-six dollars and seventy-seven cents, and the other for ninety-one dollars. Both were indorsed by the persons of whom they were purchased. In February, 1891, the larger of the two notes was

exchanged for a note of the Western Lumber Company of Kansas City; new security was taken; and the maker and indorsers of the note exchanged were released. In November, 1890, Gardner purchased of D. R. Emmons a promissory note for two thousand, five hundred dollars, made by one E. L. Brown of Kansas City, and indorsed by Emmons. At about the same time, Gardner also purchased a note made by one W. B. Grimes, of Kansas City, for about one thousand, three hundred dollars, which was secured by shares of stock in two Kansas City corporations. A considerable portion of the Grimes note has been paid, and the security which is held for the unpaid portion is nearly or quite sufficient to satisfy it. But a small amount has been realized on any of the other notes, and they are of little, if any, value. Considerable expense has been incurred in efforts to collect them, and judgments have been obtained on some of them. In all that Gardner did in purchasing the notes, in renewing some of them, and in attempting to collect them, he acted for and as cashier of the bank. The plaintiffs claim that he exceeded his authority in purchasing Kansas City paper, and was negligent in not ascertaining the financial condition of the parties liable on account of it, and its real value and the value of the securities which were obtained with it, in releasing some of the securities, and in making the investments without consulting any of his co-partners. The plaintiffs seek to recover of him the amount of the unpaid portions of the notes, and of the expenses incurred in the attempts which have been made to collect them.

When the bank was organized, the persons interested intended to incorporate it under the laws of this state, and articles of incorporation and by-laws were prepared for that purpose; but the plan of incorporating was abandoned, and the business was carried on by the

persons who had intended to incorporate, each one con-
tributing to the fund of thirty thousand dollars, which
was raised as the capital of the bank. Each person who
thus contributed was regarded as a stockholder to the
amount of his contribution, and dividends were declared
accordingly; but the persons interested in the business
were in fact co-partners, with interests in proportion
to the amount of the aggregate contributions to the
capital. It is claimed, however, that it was agreed
between the partners that the business should be con-
ducted in all respects according to the articles of
incorporation and by-laws which had been prepared,
and that Gardner made the investments in question in
violation of the provisions of those instruments which
were designed to control the making of investments.
There was some attempt made for a short time after the
business was commenced to conduct it according to
the articles and by-laws, but the attempt was soon
abandoned, and no attention was thereafter paid to
them in carrying on the business of the bank. The
larger part of that business was intrusted to Gardner as
cashier, and he made investments and transacted the
business intrusted to him according to his own judg-
ment, rarely consulting his associates to ascertain
their views in regard to what should be done. This
practice was so continuous, and of such long standing,
that it must be regarded as well known to and approved
by all parties in interest. Hurst, who had contributed
more than one-half of the capital of the bank, habitu-
ally occupied a place in the banking room. He acted
as president, and assisted somewhat in the business,
and occasionally gave directions as to what should be
done. The books of the bank were at all times open to
his inspection, and he frequently examined them or
some of them. The affairs of the bank were examined
twice each year by a committee composed of two of
the partners, and their report was presented to and

acted upon by the partners who constituted the board
of directors, at their semi-annual meetings, but no
report was required of Gardner, excepting as it was
made in the books of the bank. At about the time the
investments in question were made, the bank was
holding idle capital to the amount of more than fifty
thousand dollars, and Hurst was urging that a large
part of it should be invested. Nearly one-third of it
was money deposited by the treasurer of Decatur
county, under an agreement with the county that the
bank should pay seven and three-fourths per cent. per
annum as interest on all time deposits which should
remain in the bank six months or more, and three per
cent. per annum on daily balances in excess of two thou-
sand dollars. Opportunities for local investments were
not sufficient to absorb the portion of the idle money of
the bank which it desired to invest. It was under those
circumstances that the promissory notes in question
were offered to the bank on terms which were favorable
if the notes were good. Gardner made some inquiries
in regard to the value of the notes, and purchased them
in the belief that they were good. From facts now
known and shown in the record, it is evident that a care-
ful investigation made in Kansas City, as to the busi-
ness transactions and solvency of the various makers
and indorsers of the notes and the value of the col-
lateral securities which accompanied them, would have
disclosed facts which might have caused a prudent per-
son to decline to purchase the notes. But the evidence
in regard to the financial standing of the several per-
sons and corporations who were liable for their pay-
ment is conflicting. Some of the business men of
Kansas City who were engaged in banking and other
financial pursuits in the year 1890 state that such per-
sons and corporations were considered insolvent in
October and November of that year, while others,
constituting the larger number, testify that they

were regarded as solvent. It appears that Winner and the investment and building companies which bear his name continued to be actively engaged in carrying on business enterprises some time in February, 1891, and that they did not fail until some months later. Anderson was a mere accommodation maker of the notes which Winner indorsed, and was his teamster. That fact was not known to Gardner when he purchased the notes, and he relied, in purchasing them, upon a telegram from a reputable banker of Kansas City, in answer to an inquiry by Gardner as to whether Anderson had deposited first mortgage bonds to the amount of six thousand dollars to secure his notes for that sum, indorsed by Winner and the Winner Investment Company. The telegram read as follows: "James R. Anderson has deposited with us bonds certified to be first mortgage to secure his notes for equal amount. Our receipt issued therefor. Consider same, with indorsement, would be good." The bonds were not secured by a first mortgage, and it is claimed that Gardner was negligent in accepting the telegram as sufficient evidence that the notes were good. In purchasing the note of E. L. Brown, Gardner relied in part upon a property statement made by Brown in April, 1890, which showed that at that time his assets exceeded his liabilities by more than fifty thousand dollars, and it is said that Gardner was negligent in relying upon a property statement made so long before the purchase.

It must be admitted that Gardner did not exercise the highest decree of care and diligence which was possible in purchasing the notes in controversy; and the question we are required to determine is whether, in view of the facts disclosed by the record, his failure to exercise greater care and diligence than he did makes him liable for the loss which followed the investments. There is no evidence whatever that he acted in bad

faith, nor do we think he exceeded his authority in purchasing the Kansas City paper. Money of the bank was invested in Chicago, and, a little later, investments were made in Sioux City and Minneapolis paper. It is not at all propable that all of those investments were made without the knowledge of the president of the bank; and, even if not known at the time they were made, they were certainly known within a short time thereafter, and we are satisfied that Gardner's authority to make them was not then questioned. That he was making an honest effort to invest properly a portion of the idle money of the bank is clearly shown, and that no question in regard to the Kansas City investments was made until after the Winner failure is, we think, also established. It was the duty of Gardner to act in good faith and with entire honesty in transacting all the business of the bank, and to exercise as high a degree of care and skill as is generally exercised by business men in the management of such business. *Bank v. Johnson*, 94 Iowa, 220. But he was not liable for honest errors in judgment, nor for the failure to take the utmost precaution possible in making the investments for the bank. See *Charlton v. Sloan*, 76 Iowa, 288; *Knapp v. Edwards*, 57 Wis. 196 (15 N. W. Rep. 140). Applying these rules, we conclude that he was not so negligent in the transactions in question as to be liable for the resulting losses. This conclusion makes it unnecessary to determine questions in regard to ratification and waiver discussed in the arguments of counsel. The judgment of the district court appears to be sustained by the evidence, and is AFFIRMED.

KINNE, C. J., taking no part.