D. W. BATES, Superintendent of Banking, Receiver, Appellee, v. CHARLES J. SEEDS, Appellant.

No. 43835.

APRIL 6, 1937.

REHEARING DENIED OCTOBER 1, 1937.

Donnelly, Lynch, Anderson & Lynch, C. J. Lynch and W. M. Dallas, for appellee.

George S. Banta and McCoy & Beecher, for appellant.

PARSONS, J.—The plaintiff in this case is the receiver of the Delaware State Bank of Manchester, Iowa, which bank was adjudged insolvent May 24, 1932, and placed in receivership; plaintiff herein being superintendent of banking of the State of Iowa.

This bank was organized in 1867 as a State bank, and up to the time it was placed in receivership, May 24, 1932, it had a capital of $100,000, and assets considerably in excess of $2,000,000, the defendant being the owner of a hundred shares of stock, that is to say, one-tenth of the stock of the bank. Manchester is a town of about 3,500 people, and is the county seat of Delaware county.

This suit is in equity for an accounting, and is based upon the proposition that losses were sustained by the bank in a sum aggregating the sum of $25,000, resulting from the gross carelessness and negligence of the defendant Seeds, and his inattention to and failure to discharge the proper duties that devolved upon him.

Prior to the institution of this suit this plaintiff had begun a suit against the Fidelity & Deposit Company of Maryland, the

object of which suit was to recover $20,000 on a bond for the loss of money sustained through the dishonest act of Sloan, the cashier, whether he acted alone or in collusion with others. This suit was removed to the federal court and was tried to a jury, and a verdict was rendered against the insurer, and judgment entered thereon. An appeal was taken from the judgment therein, which appeal resulted in an affirmance, and is reported under the title of Fidelity & Deposit Company of Maryland v. Bates, Superintendent of Banking, (C. C. A.) 76 Fed. (2d) 160. In that suit each and every item involved therein is involved in this suit, and recovery was had of $15,093.33, as a judgment, all of which has been collected.

The record as shown by the federal reporter in this case begins on page 160 and ends on page 173, and thoroughly discusses the question of liability involved therein, which was as to the liability over the account of C. V. Owens, a customer of the bank, and as to the account known in the record as the "Pennsylvania Oil Company", which appears to have been a sort of partnership between one Cawley and one Jarvis. All the evidence in the present case involves exactly the same accounts.

The theory of the federal case was that the bonding company was liable because of the dishonesty of the cashier, Sloan, in dealing in these matters as he did, and in doing the things he did with reference to these accounts. So the accounts involved in this case are the accounts involved in the suit in federal court. The only difference is, practically, that Mr. Seeds was president of the bank, and it is claimed negligently permitted these things to be done. No claim that he had any part in it, or personally profited by any of the transactions.

At the conclusion of the trial in this case the district court entered a judgment against the defendant herein, for $27,773.50, with interest at 5 per cent and costs of the action, taxed at $122.40.

The court in its decree found that $2,077.84 of the liability of the defendant came from the Owens accounts, and that $22,917.65 of the liability came from the dealings with the Pennsylvania Oil Company.

In other words, the federal court suit was to recover for the losses to the bank by reason of the Owens and the Pennsylvania Oil Company accounts.

In this case the plaintiff having filed a petition for an ac-

counting, it was necessarily a case in equity, and as it was never transferred to the law docket, it was tried as such.

The defendant filed in this case, first, an answer, and then an amended and substituted answer, in several divisions. In the amended and substituted answer the first division amended simply made a general denial of each allegation in the petition, and that the defendant was in any way indebted to the plaintiff. Motion to strike and dismiss was made as to various portions of the amended and substituted answer of defendant, but none to strike the first division.

Other amendments were filed to the answer, and motions to strike the answer as amended the second time, but none striking at the general denial. These matters were taken under advisement by the court on the 16th day of December, 1935, and on the 29th day of February, 1936, the court made rulings on these motions on the pleadings, reciting in the ruling that they might be decided later. The court in his ruling on the motions, sustained the motions, striking out certain of the divisions, practically all except those covered by a general denial, then entered the decree on the 30th day of March, 1936, against the defendant, holding the defendant liable for $27,773.50, with interest thereon at the rate of 5 per cent per annum. This we take it was the amount of the claimed loss to the bank, plus interest up to the time of the entry of the judgment.

The question is raised by the plaintiff that an assignment of errors was not specifically set out on this, and hence could not be considered by the court. This was an action in equity and for an accounting. We see no reason for the defendant filing any other answer in this case than a general denial, and that he is entitled to present the case to this court for trial *de novo*. Early in the history of Iowa, in McGregor v. McGregor, 21 Iowa 441, in an opinion written by Judge Cole, on page 455 of the opinion, it was said:

"When a plaintiff files his petition for an account, if a balance is ultimately found in favor of the defendant, he is entitled to a decree for such balance against the plaintiff. And in such cases he is entitled to other affirmative orders also. Story's Eq. Jur., Sec. 522. The plaintiff, James McGregor, Jr., filed his bill against Alexander McGregor and others to set aside two deeds and for an account. The proof showed Alexander McGregor to

be entitled to a certain sum, and a judgment was rendered in his favor for the amount found due him. This affirmative relief was authorized by the rule above stated.''

In the answer in the instant case, the prayer was,

''Wherefore, this defendant prays that plaintiff's petition be dismissed and that he have judgment against the plaintiff for costs and for such other and further relief as the court may deem just and equitable in the premises.''

Had the defendant stood upon his amended and substituted answer and appealed directly to this court from the ruling striking the parts it did, it would be necessary for him to assign error to get this question properly before the court. But in this case the evidence had all been taken. If upon an examination of the whole record and the evidence as submitted it is found that the defendant owed the plaintiff anything, then of course the judgment or decree entered should be for the plaintiff.

The action the plaintiff has in this case might have been commenced as an action at law, but the plaintiff himself took the forum in which he wished the case heard, the equity side. He was not entitled to a judgment for any sum against this defendant unless the evidence showed that he was.

In McAnulty v. Peisen, 208 Iowa 625, 635, 226 N. W. 144, 149, plaintiff filed his petition at law; the defendant moved to transfer to equity, the motion was sustained and plaintiff appealed, and the case was affirmed. That was for the reason, of course, that the action was an equity action. The court in that case said:

''Demand for a money judgment in suits in equity is frequent. It does not determine that the cause is improperly brought in equity, or that the plaintiff is not entitled to equitable relief; but, under the general prayer, the court may grant any relief which, upon the facts pleaded and proved, is within the jurisdiction of equity, though not specifically demanded. * * * It is the allegations of the cause of action, and not the prayer alone, that determine the forum.''

In the instant case there can be no question about it being in equity. It is so denominated by the plaintiff. No motion was made to transfer. Besides, it demands an accounting, and an accounting action is always in equity.

The opinion in the McAnulty case further says:

"Plaintiffs in argument disclaim equitable relief. They had full opportunity to amend their petition, but did not. Their case must be determined upon their petition as they filed it and permitted the court to rule upon it, and not upon a disclaimer made in another court, in order to obtain reversal of a ruling which was correct on the record which they made in the trial court."

■■■ In the present case it does not require any ruling on the question raised by the plaintiff as to there being no proper assignment of errors. The case was fully tried, the evidence was all in, and on the record thus made before the lower court it must be determined.

■■■ If, under the facts, the defendant should be held liable, there should be a judgment for the plaintiff, and if under the facts the defendant is not to be held liable, then there should be a judgment for the defendant, for these reasons, and it is immaterial whether or not the motion to strike was overruled or sustained, so far as affecting the decision herein.

The uncontradicted evidence in the case shows that the losses involved in this action were in accounts handled by Sloan, the cashier. That Sloan was elected by the board of directors to that position, and the accounts were exclusively handled by him, and the theory of the plaintiff on which he seeks recovery is that by the negligence of the president of the bank, the defendant herein, this was permitted wrongfully, and the president is to blame in the matter, and hence there should be a recovery against him.

The question arises, Is the defendant in this case liable at all? If there is any liability, upon what does it rest?

True, the defendant was the president of the bank; Sloan was the cashier; Sloan is the party who allowed the overdrafts and the losses to be incurred therein in the Owens account; Sloan is the party who was responsible primarily for the condition of the oil company account. So it becomes necessary to examine the record to see what, if anything, Seeds, the defendant, did that makes him liable.

Take the Owens account, for instance, from the testimony of Sloan the cashier, who was responsible for the overdraft accounts. Sloan said that the Owens overdraft started on June 19, 1930, at $182.17. Mr. Seeds saw that overdraft in June, 1930,

and objected to it. Sloan said he knew at the time that the board of directors had under consideration the line of credit theretofore extended to Owens and that the maximum amount of $6,000 evidenced by notes was held by the bank. He knew that the board of directors had directed that the Owens line be reduced, that collection should be made as far as it could be made. The cashier further testified that the overdraft in July, 1930, amounted to $765.78. He said the checks continued to come in drawn against the account, and when the checks would increase the amount of the overdraft Mr. Seeds would object again. The overdraft reached $1,704.61 on August 31, 1930, and again Mr. Seeds objected to the overdraft that had accumulated, and Sloan testified that notwithstanding Seeds' objections from time to time, he would continue to pay and honor checks drawn against the overdraft; every time Seeds would come to him and object, Sloan would put him off by saying it was going to be paid. Aside from the oral objection to Sloan, he said Seeds did nothing about it.

The testimony by Sloan shows that when the overdraft started the bank had loaned Mr. Owens $6,000. It was at that time of year when money was required for seeds, farm repairs and other expenses, and he thought that fact made it necessary for the bank to allow these overdrafts. Mortgages called for liens upon all livestock and crops raised, and the money was overdrawn for paying hired help, to buy seeds, and other farm purposes, and Seeds kept objecting to the overdrafts. The amount of overdrafts was set out in the reports.

The bank had an examining committee, or loan committee, that made its examinations quarterly. It was composed of members of the board of directors selected for that purpose. This committee did not include the president of the bank. We find from examining the record and evidence that there was a meeting of the board of directors October 30, 1930, and at that time the committee made a report, by Mr. Hutchinson, which report was approved at the meeting following. A motion was made by Mr. Hutchinson,

"That we take a second real estate mortgage on the farm owned by C. V. Owens called the McDaniel Farm and also a second chattel mortgage on the 190 head of cattle that he is feeding, to secure the $2,500 that we are loaning him to take up his over-

draft and also secure our other paper in the mortgage, the $2,500 to be paid in four months. Seconded by Mr. Cawley. Carried.''

So it seems that at that time Mr. Owens' account needed attention; that the bank was taking a second mortgage on a farm of Owens', and was also taking a second chattel mortgage on cattle he was feeding, to secure the $2,500 they were loaning him to take up his overdraft; and also to secure their other paper in the mortgage. So at this time the bank, through its board of directors, had absolute notice and knowledge that Owens had an overdraft at the bank; that it was necessary that he be loaned $2,500 to take up that overdraft.

So far as the Owens item is concerned in this matter, there is no liability on Mr. Seeds. The court in that portion of the record in which he charges the defendant with this overdraft, we think was wrong, without question, and that the court below should not have found against the defendant in the decree on this item in the sum of $2,077.84. At least to this extent the decree was incorrect in holding him liable for this item, and for the interest accrued thereon up to the time of the entry of the decree.

The bank had taken, through the action of its board of directors, security for this, and among the securities taken were second mortgages upon real estate and upon livestock being fed, and hence to protect its own interests it was inevitable that the bank would have to take the chance of recovering in the event Owens was unable to scrape together money enough to feed the cattle, or in the event he could not take up the first mortgages.

So for these reasons we do not believe that this loss can now be shouldered upon Mr. Seeds, as he had nothing to do with it.

As to the other matters involved in the suit, as to the Pennsylvania Oil Company, Charles E. Cawley and W. A. Jarvis, questions arise other than those in the Owens account, and it is a more debatable proposition.

The Pennsylvania Oil Company was really owned by Mr. Cawley, one of the directors of the bank, and by one Jarvis. It was doing business on insufficient capital. Mr. Cawley had been approved by the board of directors for loans up to $20,000; he had made a statement to the bank which showed he was worth over a hundred thousand dollars. As it turned out, his statement was not as reliable as it might have been, for in the end Cawley went into bankruptcy, and the bankrupt estate paid very little.

The large overdraft of this company, or organization, was incurred in a peculiar way. From the record we gather that this account in the Delaware County State Bank was the principal account of the company, and was used as a clearing house. Mr. Jarvis appears to be quite a versatile individual; judging from the record, never anything more than a common crook. He devised a scheme of having accounts opened in a number of banks, not in the name of the company, but in the name of an employee, sometimes some one name, and sometimes another. Checks on these various accounts would be sent in to the Delaware County State Bank for credit. Mr. Sloan, in his testimony, says there were more checks drawn on the Delaware County State Bank than Mr. Jarvis brought in the deposits to cover, and he generally brought in the accounts of the Pennsylvania Oil Company, and that when Sloan found the checks brought in were greater than the amount of the balance in the account of the oil company, he instructed the employees not to return the checks, or run them on the regular check list in the evening when they were striking a balance, and instead of posting them to the account next morning, they were put on a slip marked Correction of Error. These instructions were given to two of the employees of the bank handling the matter. Sloan also said that on deposits made to that account from day to day, he instructed the girls who posted them to always charge up to the account the checks that had been held the longest, and that method was carried on and on. In response to the question as to why this was done, Sloan said: "Because Mr. Seeds would not permit the account to be overdrawn on the books, and this way we were carrying an overdraft without his knowledge"; that Seeds was very critical of overdrafts, and that this procedure was followed in order to keep him from knowing the conditions. So Sloan was acting in collusion with Jarvis in devising and carrying out this check kiting scheme.

It appears in the record that Mr. Sloan went out of town for a few days, and that while he was gone the defendant sent back these checks as they came in, hustled them through, and of course this upset the arrangements. But Sloan was back in a short time, and he ordered some of the checks returned, and continued the float. The bank kept an overdraft book, but these matters never went on the overdraft book. This was to keep it from the knowledge of Mr. Seeds. These checks are all listed in

Exhibit 517, which covers pages 185 to 192, inclusive, of the abstract. Each check that was carried over this way, that was retained in the bank but was not shown on the books, except on the correction slip, is marked "x" in Exhibit 517. They run from September 2 to October 17, 1931, and we find therein a total of 95 "x" marked checks. In other words, there were that many checks that had been carried over during this period of from September 2 to October 17, 1931, many of the checks quite large, until the accumulation of carried-over checks involved in the kite amounted to $7,361.65 on October 19, 1931. The total of items involved in this list of checks in the kite is 201; some of them marked "x" were carried several days, so it is not accurate to say that the number of checks was 95, but checks were carried over that many times.

Mr. Jarvis in his testimony states that about the 21st of June, 1931, (which must have been about the time Sloan was out of town for a few days) certain checks drawn on the Pennsylvania Oil Company account were returned for want of funds. That immediately gave rise to the crisis in the operations. He then tells that he wrote a letter to Seeds on June 21, 1931, setting out the situation and begging for consideration of the matter so that their account would not collapse. Checks were invariably sent back during the time that Sloan, conspirator with Jarvis, was out of town. He was gone but a short time; he came back. In the kite to which we have referred, were a large number of checks marked "x", and this did not begin until September 2, 1931. What happened in the interim no one knows, but from September 2, 1931, to and including October 19, 1931, the checks in the kite were flying pretty high. The Delaware County State Bank lost during the period $7,361.65 by this kite alone. While all this time Sloan was concealing this matter, so far as he could, from Seeds. Why was he concealing it? The logical answer can only be that he feared if Seeds found it out there would be found a way to stop it. Seeds was an old man; deaf as an adder. He was around the bank, of course; he distributed the mail, of course, placed it where it belonged. He looked over the books to some extent, but these things could not be discovered by looking over the bank. There was no claim that he did not go over the books of the bank. Besides, Sloan was an officer of the bank, elected by the board of directors, the same as was Mr. Seeds. Each had certain duties to perform. Mr. Seeds had to rely on Sloan doing his duty as it was

required; he was not necessarily compelled to check over every item that went through the bank; he had his own business to look after, looking after investments, buying bonds, and he assisted at the window when others were busy. Sometimes in the evening he went over the books, but he was not chargeable with what the books did not show. Whatever happened after the letter which Jarvis says he wrote to Seeds, happened a long time afterward, not until September 2, the date the last bunch of checks in the kite commenced. So we say there is insufficient evidence to charge Mr. Seeds with responsibility for these actions of Sloan; insufficient evidence to charge him with negligence in not having reported it to the bank.

The appellee cites and relies on Dresser v. Bates (C. C. A.) 250 Fed. 525; Bates v. Dresser, 251 U. S. 524, 64 L. Ed. 388, 40 S. Ct. 247, 249. In that case the bank was a little bank, with $100,000 capital, and an average deposit of about $300,000. It had a cashier, bookkeeper, a teller, and a messenger. Before and during the time of the losses Dresser was its president and executive officer, a large stockholder, with an inactive deposit of from $35,000 to $50,000. One Earl was cashier. One Coleman entered the service of the bank as a messenger in September, 1903. In 1904 he was promoted to be a bookkeeper. In the previous August an auditor employed on the retirement of a cashier had reported that the daily balance book was very much behind, that it was impossible to prove the deposits, and that a competent bookkeeper should be employed upon the work. Coleman kept the deposit ledger, and this was the work that fell into his hands. During 1904-5 there were shortages in the accounts of three successive tellers, that were not accounted for. Dresser asked one of the employees to resign. Before resigning he told Dresser some one had taken the money and if he were allowed to stay he would set a trap and catch the man, but Dresser did not care to do that, and thought there was nothing wrong. Coleman was then acting as paying and receiving teller, in addition to his other duties. During that time there were no shortages disclosed in the teller's accounts. In May, 1906, Coleman took $2,000 from the vault of the bank, but restored it the next morning. In November, 1907, thefts again began to show up, those involved in the case. Having a small account at the bank, he would draw checks for the amount he wanted, exchange checks with a Boston broker, get cash for the broker's check, and, when his own check came to the

bank through the clearing house he would abstract it from the envelope, enter the others on his book, and conceal the difference by a charge to some other account, or deposits in the depositors' ledger. So far as Coleman thought it necessary, in view of the absolute trust in him on the part of all concerned, he took care that his balances should agree with those in the cashier's book. By May 1, 1907, Coleman had abstracted $17,000, concealing it by false additions in the deposit ledger. By November, 1907, Coleman had taken $30,000; in 1908, $33,000. His shortages kept growing until they reached $310,143.02. It was not until 1909 that it was discovered, by a bank examiner. The court said in this case:

"The question of the liability of the directors in this case is the question whether they neglected their duty by accepting the cashier's statement of liabilities and failing to inspect the depositors' ledger. The statements of assets always were correct."

It was further held by the court that they would not reverse the findings of the master and the circuit court of appeals that the directors should not be held answerable for taking the cashier's statement of liabilities to be as correct as the statement of assets always was. It held further,

"The position of the president is different. Practically he was the master of the situation. He was daily at the bank for hours, he had the deposit ledger in his hands at times, and might have had it at any time. He had had hints and warnings in addition to those that we have mentioned,—warnings that should not be magnified unduly, but still that, taken with the auditor's report of 1903, the unexplained shortages, the suggestion of the teller, Cutting, in 1905, and the final seeming rapid decline in deposits, would have induced scrutiny but for an invincible repose upon the status quo." The court further said: "However little the warnings may have pointed to the specific facts, had they been accepted, they would have led to an examination of the depositors' ledger, a discovery of past and a prevention of future thefts."

This case presents a record far short of what was before the federal court in the Dresser cases. The president in the Dresser case was practically the whole bank, the largest stockholder; he had a large deposit. It was a one-man bank. In the Delaware

County State Bank it was not a one-man bank. Seeds had only one-tenth of the stock; there was an active board of directors, as the record shows. All of the facts that would tend to disclose the losses that came about from the Pennsylvania Oil Company and the Owens accounts were kept concealed from the president by the cashier elected by the directors.

Much is made in the argument of plaintiff, appellee, in regard to a letter which Jarvis claims to have written to Mr. Seeds in June, 1931. This was claimed to have been sent to the defendant Seeds, and to have been put in the possession of Mr. Cawley. Both Mr. Seeds and Cawley deny any recollection of the letter. What was purported to be a letter-press copy was produced, evidently by Jarvis. Jarvis was not only an expert at kiting checks, as evidenced by his success in this case, but he was a convicted felon; that is to say, he was convicted of a crime for which he might have been sent to the penitentiary. He testified that Mr. Cawley got the letter a long time ago, through Mr. Swift, an attorney at Manchester. He said he didn't have the letter until it was brought down and shown to him, and that, "At the time they brought them to me, I was in jail in Manchester. At the time I was serving twelve months in the county jail. I was convicted on the charge there in connection with a bad check or uttering a false check." Jarvis said he did the typing on Exhibit 1 himself; that he kept a copy of the letter with his other papers in the office.

So the sole testimony as to the existence of this letter is from a convicted felon; convicted under provisions of section 13047 of the Code, which provides:

"* * * if such check, draft or written order shall be for the sum of twenty dollars or more, and shall on conviction thereof be punished as in section 13045."

This last section referred to calls for imprisonment in the penitentiary for not more than seven years, or be fined not exceeding five hundred dollars, or be imprisoned in the county jail not exceeding one year, or be punished by both such fine and imprisonment.

So we think this claimed letter, under the circumstances, is not entitled to much credence.

This brings this case then to the question of what would be the liability of the defendant in such a case; upon what is it

based; what are the relations in a bank between the president of the bank and the cashier, employed by the board of directors, and just how far has the president to watch the cashier, who is elected by the board of directors, with certain duties to perform, to see that these duties are performed?

It was a matter of judgment with Mr. Seeds, when he found overdrafts, as to what should be done with them. He always, the record shows, insistently and persistently objected to overdrafts when he discovered them, but without the exercise of more than extraordinary diligence he could not have discovered the overdrafts in the Pennsylvania Oil Company account.

In a banking partnership case, Exchange Bank of Leon v. Gardner, 104 Iowa 176, 73 N. W. 591, it was held that it was the duty of a partner in a banking business, to whom is left the active management of the business, to act in good faith, and with entire honesty, in transacting all the business of the bank, and to exercise as high a degree of care and skill as is generally exercised by business men, in the management of such business; but he is not liable for honest errors in judgment, nor for the failure to take the utmost precaution possible, in making investments for the bank.

Here Mr. Seeds objected. Naturally he would suppose that when he objected the thing would stop. The cashier was a bonded officer, selected by the board of directors. Should he, upon this occasion, have gone to the board of directors and asked them to remove the cashier? We think not. His failure to do so would not be negligence. He was acting as a reasonably prudent man would in the exercise of due care. Again, in Watt v. German Savings Bank, 183 Iowa 346, 165 N. W. 897, this contention is fully supported.

In Strain v. Mekvold et al., 257 N. W. 50 (S. D.), the supreme court of South Dakota held that the statute making officers and directors of banks personally liable for overdrafts, was not intended to make officers and directors insurers of fidelity of bank's agents. In this case overdrafts which were not charged to accounts of drawers but were concealed and carried as cash items, constituted misapplication of funds of bank and were not "overdraft allowed by bank", within the statute making officers and directors personally liable for overdrafts allowed by the bank, because cashier's knowledge of misapplication of bank's funds was not imputed to the bank.

In the instant case all overdrafts in the Pennsylvania Oil Company account were concealed in the bank, were concealed from the president. The invention of Correction of Error slips and the use of them by the cashier Sloan, was solely for the purpose of deceiving Mr. Seeds and the bank.

It has been held time and again that ordinarily the cashier of a bank is its managing officer, and the powers of a president as such are very limited, unless special duties are conferred on him by the board of directors.

Section 9210 of the Code provides:

"The business and property of each state bank shall be managed by a board of directors of not less than five, all of whom shall be shareholders."

The directors are the persons charged with the management of the bank. This board selects the various officers of the bank. It selected Sloan and entrusted him with the management of the affairs of the bank so far as they fell within his duties as cashier.

We do not see anything in the record that in any way shows that so far as the board of directors was concerned, it conferred any power on Mr. Seeds except the powers naturally and inherently belonging to the president of a bank. It conferred full powers on Sloan, by his appointment, to discharge all the duties of the office of cashier, so it seems to us there can be no question but that evidence must show that the duties to check over the books to find out whether the cashier was attending to his duties as he should, were never conferred upon the president, and he never assumed that duty, although he did from time to time examine the books, and the record shows his examination of them disclosed nothing until in October, 1931. He had no idea of what had been going on by reason of the efforts at concealment by Sloan and Jarvis.

This court said in Griffin v. Erskine, 131 Iowa 444, at page 448, 109 N. W. 13, 15, 9 Ann. Cas. 1193:

"Ordinarily the cashier of a bank is its managing officer, and the powers of the president as such are very limited, save as conferred on him by the board of directors. Morse on Banks, Sec. 144."

The position of president of a bank does not subject the holder thereof to any greater liability for the affairs of the bank

than would the position of a member of the board of directors, unless the board of directors had committed a duty to the president, or by long acquiescence in his exercise of that duty. In the case of Cornick v. Weir, 212 Iowa 715, 728, 237 N. W. 245, 250, the court quoted approvingly from Mason v. Moore, 73 Ohio State 275, 76 N. E. 932, 4 L. R. A. (N. S.) 597, 4 Ann. Cas. 240, the following:

"The directors of a bank are surely authorized to appoint a cashier conferring upon him the powers usually exercised in such an office. He is properly confided in as to the custody of its money, securities, books and valuable papers, and the supervision of its books and accounts. While it is true that the directors cannot divest themselves of the duty of general supervision and control, they may properly intrust to him the powers usually appertaining to the direct management of the business, and, where they have acted in good faith and with ordinary diligence in their general supervision, they are not liable for losses resulting through secret speculations and secret false entries of the cashier. Their position does not require them to devote themselves to the details of the business, which may be left to the clerks and bookkeepers under the supervision of the cashier. They are not required to look with suspicion upon the conduct of these agents or employees, nor to practice a system of espionage over the cashier or his subordinates without apparent reason, and they have a right to assume they are honest and faithful, where no circumstances transpire to excite doubt or suspicion. On the other hand, they cannot excuse their indifference or negligence by pleading mere honesty of intention."

The latter part of the quotation does not, it seems to us, require the president of a bank, merely because he is the president, to look with suspicion upon the conduct of these agents or employees, or to practice a system of espionage over the cashier and his subordinates without the best of reason, and they have a right to assume they are honest and faithful, where no circumstances transpire to excite doubt or suspicion.

We see no circumstances in this case which could create suspicion. When the overdrafts appeared and they came to the knowledge of the president, he strenuously objected. He was assured things were all right by the officer who had charge of

86

these matters, and he had a right to suppose that his suggestions would be carried out.

This suit here is an action in equity. It was commenced as such by the plaintiff. If it were a jury case, and under the record made herein the jury found the defendant liable, the questions would be different than the questions presented here. If there was any substantial evidence whatever to sustain the verdict of the jury; for instance, the testimony of Jarvis as to the letter written in June 1931; possibly we might not feel like disturbing the verdict of the jury. But that is not the case here. This suit is in equity. When it is appealed to this court it is triable *de novo*. We are supposed to look over the record, and do, and we have the same right to say as a jury would have to say, what we think of that record. And viewing the record as a whole, we are of the opinion there was not sufficient evidence in this case to warrant recovery against the defendant herein, and for these reasons the judgment of the lower court is hereby reversed and remanded to the district court of Delaware County for entry of a decree for the defendant in accordance with the views expressed herein.—Reversed and remanded.

RICHARDS, C. J., and STIGER, ANDERSON, SAGER, HAMILTON, MITCHELL, KINTZINGER, and DONEGAN, JJ., concur.